**RESOLUTION TRUST CORPORATION, in its Corporate Capacity, Plaintiff,**

v.

**H.R. "Bum" BRIGHT, Individually and as Predecessor Trustee for, and Clay Van Ness Bright as Successor Trustee for, Martha Carol Bright Reeder Trust, Margaret Louise Bright Petty Trust, Christopher Roberts Bright Trust; H.R. Bright as Predecessor Trustee for, and Christopher Roberts Bright as Successor Trustee for Clay Van Ness Bright Trust; James B. "Boots" Reeder; Robert B. Payne, Individually and as Predecessor Trustee for, and Clay Van Ness Bright as Successor Trustee for William Christopher Reeder Trust, Bryan Taliaferro Reeder Trust, Caroline Bright Reeder Trust, Nathan Bright Petty Trust, Margaret Louise Petty Trust, Elizabeth Carrie Petty Trust, Bradford Clay Petty Trust, and Christopher Roberts Bright Children Trust; and Robert B. Payne as Predecessor Trustee for, and Christopher Roberts Bright as Successor Trustee for Stuart Harvey Bright Trust, Justin Clay Bright Trust, and Parker Madison Bright Trust, Defendants.**

Civ. A. No. 3–92–CV–0995–D.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 10, 1995.

Stewart R. Werner (argued) and Johnny K. Merritt of Mullin Hoard & Brown, L.L.P., Amarillo, TX, Victor L. Roy, III and Kyle M. Keegan of Roy, Kiesel, Aaron & Tucker, Baton Rouge, LA, Richard M. Lannen, Diane Snelson, and Janice Parker of Lannen & Oliver, P.C., Dallas, TX, and Carolyn Pratt Perry of Resolution Trust Corp., Washington, DC, for plaintiff.

Ernest E. Figari, Jr., A. Erin Dwyer (argued), and Donald Colleluori of Figari & Davenport, L.L.P., and Rosemary Stewart of Akin, Gump, Strauss, Hauer & Feld, Dallas, TX, for defendants H.R. Bright and James B. Reeder.

Robert H. Mow, Jr. and Alec Bramlett of Hughes & Luce, L.L.P., Dallas, TX, for Robert B. Payne.

FITZWATER, District Judge:

When an agency of the United States becomes the conservator of a failed financial institution and sues directors and officers for causing damage to the institution, the agency must occasionally rely on tolling doctrines to avoid limitations periods that expired before its appointment as conservator. The limitations periods and, in turn, the tolling doctrines are typically governed by state law, thus obligating federal courts to comprehend and apply jurisprudence developed by other courts in other contexts. The questions presented are important ones. Potentially meritorious claims of considerable magnitude can be precluded if the limitations periods are not tolled; statutes of limitations, which reflect legislative policy choices, can be compromised for insufficient reasons.

The present case presents such questions, including whether the adverse domination doctrine "majority rule" requires a numerical board majority of wrongdoers, and whether acts of constructive fraud and all types of grossly negligent conduct can constitute the level of culpability necessary for adverse domination tolling. The court must also decide whether the applicable limitations period is tolled pursuant to the discovery rule and on the basis of fraudulent concealment, and whether a federal-law gross negligence action brought pursuant to 12 U.S.C. § 1821(k) is time-barred. Because the court holds the claims in question are precluded by the applicable statute of limitations, it grants defendants' motions for partial summary judgment.

## I

### A

Plaintiff Resolution Trust Corporation ("RTC"), in its Corporate Capacity, sues defendants H.R. Bright ("Bright"), James B. Reeder ("Reeder"), and Robert B. Payne ("Payne"), as well as the predecessor and

successor trustees of various Bright family trusts, alleging they are liable for acts and omissions that injured the failed Bright Banc Savings Association ("Bright Banc"). *See RTC v. Bright*, 157 F.R.D. 397, 399–400 (N.D.Tex.1994) (addressing appeal from magistrate judge discovery order). Insofar as relevant to the present motions for partial summary judgment, the RTC contends Bright, Reeder, and Payne were negligent, grossly negligent, and breached (or aided and abetted the breach of) fiduciary duties in connection with Bright Banc's 1985 acquisition of Dallas Federal Savings and Loan Association ("Dallas Federal").

The RTC alleges that defendants agreed as shareholders to contribute in excess of $65 million in cash or cash equivalent assets to Bright Banc by June 30, 1986, and misrepresented the value of the assets so as to mislead Bright Banc and federal regulators into believing that the institution had sufficient regulatory capital, and thereby obtain approval for the acquisition of Dallas Federal. The RTC contends that Bright, Reeder, and Payne engaged in improper and unlawful manipulations of Bright Banc's records and reports to distort its regulatory net worth and net worth requirements, and made material misrepresentations and omissions concerning compliance with regulatory agreements relating to the Dallas Federal acquisition. The RTC also avers that, without performing an adequate due diligence investigation, and disregarding the extraordinary risk to Bright Banc and its depositors, defendants caused Bright Banc to expend over $100 million of depositors' money to purchase Dallas Federal, which had a net worth of less than $6 million and had lost in excess of $57 million the preceding year.

### B

Bright, Reeder, and Payne now move for partial summary judgment, contending the RTC's claims based upon the acquisition of Dallas Federal—actions for negligence and gross negligence (count VII), breach of fiduciary duty (count VI), and aiding and abetting breach of fiduciary duty (count VIII)—are barred by limitations.[1] Defendants argue that the RTC cannot defeat their limitations defense by invoking any one or more of three tolling theories: adverse domination, the discovery rule, and fraudulent concealment. They contend the summary judgment evidence demonstrates the RTC's inability to present a genuine issue of material fact with regard to any of these doctrines.

According to defendants, the record shows that during 1985 the board of directors of Bright Banc was composed of 13 members, including one advisory director. During 1986 the board consisted of 19 members, including two advisory directors. The RTC has sued only three former members of the board—Bright, Reeder, and Payne—and has taken the position that all other directors of Bright Banc were "non-culpable" with respect to the conduct for which the RTC sues.[2]

On August 2, 1985 Bright Banc executed an Agreement of Merger (the "Merger Agreement") to acquire Dallas Federal and merge it into Bright Banc. At a meeting of Bright Banc's board of directors on July 25, 1985 the Merger Agreement was approved by the unanimous vote of the directors present. In addition to defendants Bright, Reeder, and Payne, 10 other directors of Bright Banc voted to approve the Merger Agreement.

On August 5, 1985 Bright Banc filed an application with the Federal Home Loan Bank Board (the "FHLBB") for approval of the proposed merger. The FHLBB approved the request on December 27, 1985, and four days later the transaction was closed.

---

**1.** Bright and Reeder filed their motion on February 24, 1994. Payne filed his motion on April 13, 1994, in part adopting the limitations arguments of Bright and Reeder addressed to the RTC's claims based on the Dallas Federal acquisition. The court convened oral argument on both motions on July 29, 1994. The court thereafter permitted supplemental briefing, which concluded on September 13, 1994. On January 5, 1995 the RTC filed an application for leave to file its second supplemental response, which, as the court explains *infra* at § II, the court has considered to the extent it relates to the present motions.

**2.** *See* discussion *infra* at note 7.

More than two years before the date of the FSLIC conservatorship, Bright Banc's directors knew of the alleged problems with real estate owned ("REO") and commercial loans that Bright Banc had acquired from Dallas Federal. According to the RTC's evidence, 27 commercial loans and eight REO properties in Dallas Federal's portfolio constituted "problem loans and investments" that were known to the directors by at least December 1985. The CEO of Dallas Federal Financial Corporation provided Bright Banc a December 31, 1985 closing certificate that identified 25 troubled real estate loans and real estate projects. Within two months after the acquisition of Dallas Federal, Bright Banc was aware of the serious financial problems of Dallas Federal and determined that it needed to write down the Dallas Federal loan portfolio by approximately $101 million and its REO portfolio by approximately $9.5 million.

In a March 31, 1986 letter, Bright Banc's auditors, Arthur Young & Co. ("Arthur Young"), reported to Bright Banc's board that it had examined the purchase accounting adjustments arising from the acquisition of Dallas Federal and that the cost of the acquisition was approximately $207 million in excess of the fair market value of the net assets acquired.

In a report of examination dated as of March 10, 1986, the FHLBB noted that the Dallas Federal acquisition had caused an increase in the number of problem loans and REO at Bright Banc. The report also analyzed and critiqued 25 of Bright Banc's classified loans and REO. The 1986 examination report was delivered to Bright Banc's board of directors by letter dated August 5, 1986.

A detailed supervisory letter from the Federal Home Loan Bank of Dallas ("FHLB–Dallas") was delivered to Bright Banc's board of directors on or about November 26, 1986. The letter noted Bright Banc's high level of substandard assets and scheduled items as a major factor in the institution's failure to meet its June 30, 1986 minimum regulatory net worth requirement.

FHLB–Dallas representatives met with Bright Banc's entire board of directors on or about December 4, 1986. A written report of the meeting recounts that the board of directors was requested to address the present unfavorable financial operation of Bright Banc. Reeder stated that most of the problems were due to nonperforming assets acquired through the mergers with Texas Federal Savings and Loan Association ("Texas Federal") and Dallas Federal.

In a letter to the FHLB–Dallas dated December 18, 1986, and signed by each member of Bright Banc's board of directors, the board stated:

> The Management of Bright Banc agrees that scheduled items are at unacceptable levels and has implemented procedures to reduce the level of these assets.

> It is important to note that 94% of these scheduled items originated from our acquisition of Texas Federal in December, 1984, and Dallas Federal in December, 1985. The lending policies and procedures of these institutions have been abolished and more stringent ones have been adopted to better reflect Bright Banc's philosophies.

The Texas Savings and Loan Department issued a Report of Examination as of June 30, 1986, noting Bright Banc's failure to meet its minimum regulatory net worth requirement. The report stated that over $200 million of Bright Banc's substandard assets, or almost 40%, were inherited from Dallas Federal. This report was forwarded to Bright Banc's board of directors on October 23, 1986.

In defendants' view, a non-culpable majority of the Bright Banc board knew of, or reasonably could have known, of the claims against defendants prior to February 10, 1987. Accordingly, the two-year statute of limitations on all claims commenced and expired prior to February 10, 1989, when the Federal Savings and Loan Insurance Corporation ("FSLIC") became Bright Banc's conservator.

### C

The RTC counters that there are numerous genuine issues of material fact that preclude summary judgment on the tolling doctrines.

According to the RTC, 11 Bright Banc directors voted on July 25, 1985 to approve the Dallas Federal merger, despite the fact that Dallas Federal's earnings were continually declining. Financial reports of Dallas Federal showed net losses in each quarter of 1985, including a year-end loss of $57,896,000. Bright Banc's regulatory counsel noted prior to the acquisition that Dallas Federal's scheduled items had increased substantially from 1983 to 1984. He was fearful that there were a number of "soft loans" in the portfolio. Reeder had problems with Texas Federal and therefore was skeptical of the management of Dallas Federal. The chief financial officer of Bright Banc was also aware prior to the December 31, 1985 closing date of the declining financial picture at Dallas Federal. Bright admitted that he knew that Dallas Federal was developing loan problems and was losing money during 1985, and that the other directors were aware that the financial condition of Dallas Federal during 1985 was deteriorating.

Before December 31, 1985 the real estate market in Dallas and North Texas was deteriorating, which caused Dallas Federal to experience losses. A November 18, 1985 memorandum prepared by a Bright Banc officer reported to defendant Reeder that the major Texas real estate markets were overbuilt and that the overall economy was weak. Bright believed that reports concerning the declining real estate economy were presented to the Bright Banc board of directors.

Prior to the closing, Dallas Federal was under investigation by the Securities and Exchange Commission ("SEC") concerning the adequacy of Dallas Federal's loan loss reserves.

The principals of Bright Banc were anxious to close the merger by year-end 1985. This anxiety was based, at least in part, on certain tax loss carryovers that might not be available in 1986. There was also concern that FHLBB's associate general counsel might look at the merger application "too closely."

Reports concerning pending federal tax legislation that could make many new real estate deals uneconomical were also made to the board of directors during 1985. Reports were also received during the last half of 1985 that Dallas Federal was encountering a rising level of problems with its commercial and residential real estate loans.

Bright Banc ceased its due diligence investigation of Dallas Federal in November 1985, purportedly because of a Rebuttal of Control Agreement ("RCA"), which Bright Banc executed in view of its desire to acquire additional Dallas Federal stock on the open market. Reeder reported that Bright Banc was not provided the type of information that would have allowed Bright Banc to make a more accurate determination of the amount of potential problem assets. Bright contended that the FHLBB prohibited the institution from performing adequate due diligence. According to FHLBB counsel, the RCA should not have prevented Bright Banc from completing due diligence, and it would have been "incredibly stupid" for someone to contract away that right. The due diligence efforts were not completed before the acquisition closed.

Bright had learned of problems or deficiencies in the Texas Federal loan portfolio within six to twelve months after acquiring Texas Federal. Bright recognized that Dallas Federal and Texas Federal had comparable portfolios. The problems or deficiencies that were noted in the March 1985 examination report of Texas Federal came as a surprise to the Bright Banc board of directors. Bright did not recall whether the revelation of these problems prompted a change in the way that Bright Banc conducted its due diligence investigation of Dallas Federal.

The board of director minutes for 1985 reveal no discussion among the directors regarding the true value of Dallas Federal, the decreasing earnings of that institution, the SEC investigation, or the cessation of due diligence. Bright was subjectively aware of the risks of proceeding with the Dallas Federal acquisition. His apprehensions included the status and projections for the real estate economy in the Dallas, Texas area. Bright did not remember whether any of these concerns were shared with the other directors of Bright Banc except for Reeder and one other director.

According to Bright Banc's accountants, Bright Banc paid $207,469,000 in excess of the fair value of the net assets acquired from Dallas Federal. The acquisition involved the expenditure by Bright Banc of $103,895,000 for an institution that had a value of negative $103,624,000. The board of directors was not surprised by the accountants' report because the board had projected paying $180 million to $190 million dollars more than the fair value of the net assets acquired. Neither the report, nor the December 18, 1986 letter to the FHLB–Dallas that the board signed, led Payne to suspect a claim existed.

As of July 1985 and thereafter, Bright, Reeder, and Payne, individually or as trustees of Bright family trusts, collectively controlled more than 96% of the Bright Banc stock. The chief financial officer of Bright Banc regarded Bright as "the owner" of the institution. When the officer reported to Bright that Dallas Federal's earnings were less than expected, that the transaction did not look as good as it had before, that the acquisition price should be lower, and that Bright Banc should explore ways to terminate the merger, Bright merely replied that he made a deal and he would stick with his deal.

When Bright had a "cold feet meeting," in which he struggled over whether to acquire Dallas Federal, the gathering involved only Bright, Reeder, and one other director and was held outside the presence of the board of directors. Bright called the meeting because he represented a "big share of the vote." Bright does not recall whether this meeting was ever discussed with the board of directors. Payne does not recall that it was discussed.

The directors were elected by the shareholders, who consisted of Bright and members of his family. According to a former director of Bright Banc, he had never seen the board of directors tell Bright or Reeder "no."

The directors who approved the merger with Dallas Federal represented the majority of the directors of Bright Banc in March 1987 and into 1988. At no time after the Dallas Federal merger did the minutes of directors meetings reveal any discussion of a claim or potential lawsuit against Bright, Reeder, and Payne or other directors.

In November and December 1987 Bright Banc's counsel prepared memoranda regarding potential litigation against directors and officers of Dallas Federal, thus raising an inference that claims arising from the Dallas Federal merger were not discovered until after February 10, 1987.

The RTC argues that the evidence presents genuine issues of material fact whether the limitations period was tolled.

## II

■ The court addresses as a threshold matter the RTC's request that the court continue consideration of these motions pursuant to Fed.R.Civ.P. 56(f).

In response to Bright and Reeder's motion, the RTC urged that additional discovery was needed on the limitations issues presented by defendants. It contended in its brief filed March 16, 1994 that deposition discovery had commenced in October 1993 and, of 40 witnesses thus far deposed, only two were former Bright Banc directors at the time of the merger. *See* P. Resp. to Bright/Reeder MPSJ at 2. The RTC argued that it should have the opportunity to depose all Bright Banc directors and other officers before the court decided defendants' motion. *Id.* It maintained that more discovery was needed on the issue whether the entire board was more than negligent in approving the Dallas Federal acquisition; whether Bright and Reeder adversely dominated Bright Banc; and whether Bright Banc directors ever discovered the claims against Bright and Reeder, including whether defendants actively concealed from the other directors the condition of Dallas Federal, other facts, and the deficient due diligence investigation. *Id.* at 2–3. The RTC also posited that discovery was needed on the adverse domination issue to establish conclusively the culpable defendants' level of control over Bright Banc and to determine what they knew, *id.* at 12 n. 2, and was required regarding any information that Bright and Reeder concealed from the other directors, *id.* at 15 n. 5.

In response to Payne's motion, the RTC urged in a brief filed May 3, 1994 that it sought the opportunity to discover additional evidence, if necessary to do so, because the discovery deadline was five months off and the expert designation deadline had passed only the day prior to the date the RTC filed its response. *See* P. Resp. to Payne MPSJ at 2. The RTC maintained that its experts should have an opportunity to complete their work and provide affidavits in opposition to summary judgment. *Id.* It stated that some of the experts would testify that it was gross negligence for the board to allow the acquisition to proceed in the face of an investigation of Dallas Federal by the SEC and before due diligence efforts were completed. *Id.* The RTC contended that none of the defendants had been deposed and that the RTC should have the opportunity to complete discovery before the motion was decided. *Id.* at 2–3. It argued that discovery taken since the RTC responded to Bright and Reeder's motion had elicited even more important facts. *Id.* at 3.

On July 29, 1994—the date the court convened oral argument on these motions—the RTC filed an application for leave to file a supplemental response to defendants' motions. On August 24, 1994 the court granted the RTC's application for leave. The court construed the application "as a variation of the Fed.R.Civ.P. 56 requests for continuance contained in [the RTC's] responses to defendants' partial summary judgment motions." Aug. 24, 1994 Order at 2.[3]

In the RTC's supplemental response, no additional Rule 56(f) continuance motion was made. The RTC's July 29, 1994 application

for leave to file the supplemental response did not contain a request for a continuance.[4] At oral argument of these motions, the RTC's counsel referred to the requests for Rule 56(f) relief, noting that the RTC had asked the court to consider a continuance if the RTC had not provided sufficient facts to avoid summary judgment. *See* Tr. Oral Arg. at 85. Counsel mentioned the Rule 56(f) requests, however, in connection with the RTC's then-pending application for leave to file a supplemental response. He concluded by stating, "But the point is we believe there are enough facts at this point to raise a genuine issue on these tolling [arguments]." *Id.*

On January 5, 1995 the RTC filed an application for leave to file a second supplemental response to defendants' motions for partial summary judgment. This application is addressed to the instant motions and to other subsequently-filed motions that were not argued on July 29, 1994 and are not decided today. In this application the RTC asks for leave to tender expert witness reports received after the RTC filed its summary judgment responses and supplemental responses. Once again, no Rule 56(f) continuance is requested; the RTC states that "the supplements are merely to present to the Court the expert witness reports that were prepared since the deadline for responding to defendants' partial summary judgment motions." P.2d Applic. Leave at 1.

The court concludes that the RTC has been granted all the Rule 56(f) relief it seeks. After defendants filed their respective motions on February 24 and April 13, 1994, discovery continued in this case. The court

---

3. The court wrote:
 The RTC contends in its application that additional issues of fact have arisen by virtue of ongoing discovery. Presumably, this discovery presents facts that the RTC would have relied upon in an initial response, rather than a supplemental response, had Rule 56(f) relief been granted earlier in 1994. Given the deference with which such motions are viewed, the court grants the application.
 *Id.*

4. The essence of the relief requested is set forth in these three paragraphs from the motion:
 1. Discovery is continuing in this case and, as discovery progresses, additional issues of mate-

rial fact are revealed. For example, since the RTC's March 16, 1994 and May 3, 1994 responses, the RTC has had the opportunity to depose, among others, the defendant H.R. Bright. Mr. Bright has testified concerning various matters that establish genuine issues of fact.
 2. This testimony should be considered before considering the Defendants' motions for partial summary judgment.
 3. Therefore, RTC respectfully applies for permission to file the attached supplemental response.
 P.Applic.Leave at 1.

has already afforded the RTC an opportunity to rely on the fruits of this discovery to oppose summary judgment in a supplemental response submitted five months (using the date of the RTC's application for leave) after Bright and Reeder filed their motion. Moreover, without deciding whether the RTC's January 5, 1995 application should be granted to any greater extent (no response to the application is due at this point), the court will consider the RTC's new expert evidence insofar as it relates to the Dallas Federal acquisition. With respect to the motions decided today, the RTC has obtained all the relief it requested initially.

Alternatively, if the RTC is still applying for a Rule 56(f) continuance, the court holds that no additional delays are necessary or warranted. The record reflects that the RTC has conducted essentially all the discovery it requested, and has obtained expert reports. It has been given the opportunity to submit this additional evidence in opposition to defendants' motions. It has not identified grounds for another continuance. As its counsel stated at oral argument, the RTC believes it has adduced sufficient facts to avoid a limitations bar. The RTC has not shown why it needs still more discovery and how this will create a genuine issue of material fact, as is required in this circuit. *See, e.g., Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1442 (5th Cir.1993).

### III

Defendants contend the RTC's claims for negligence, gross negligence, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty are barred by limitations to

the extent based upon Bright Banc's acquisition of Dallas Federal.

■ The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 1989 U.S.C.C.A.N. (103 Stat.) 183 ("FIRREA"), includes a statute of limitations. *See* 12 U.S.C. § 1821(d)(14).[5] The date on which the limitations period commences is the later of the date the RTC (or its predecessor, the FSLIC) is appointed as conservator or receiver, or the date on which the cause of action accrues. *See id.* § 1821(d)(14)(B); *FDIC v. Dawson,* 4 F.3d 1303, 1306–07 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). The Fifth Circuit has consistently held, however, that if a claim has become time-barred under the applicable state statute of limitations prior to the date of the conservatorship, FIRREA will not revive the claim. *See id.; RTC v. Seale,* 13 F.3d 850, 854 (5th Cir.1994); *FDIC v. Shrader & York,* 991 F.2d 216, 220 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *FDIC v. Belli,* 981 F.2d 838, 842 (5th Cir.1993). Therefore, before reaching the question whether FIRREA's limitations period bars the RTC's lawsuit, the court "must first determine whether the applicable Texas limitations periods had expired when [the RTC] (or its predecessor, FSLIC) acquired the state law causes of action it now alleges." *FDIC v. Howse,* 736 F.Supp. 1437, 1440 (S.D.Tex.1990).

In this case, defendants do not challenge the timeliness of the RTC's lawsuit under the FIRREA component of the limitations equation. They argue that the claims were time-

---

**5.** 12 U.S.C. § 1821(d)(14):

Statute of limitations for actions brought by conservator or receiver

(A) In general

Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6–year period beginning on the date the claim accrues; or

(II) the period applicable under State law; and

(ii) in the case of any tort claim, the longer of—

(I) the 3–year period beginning on the date the claim accrues; or

(II) the period applicable under State law.

(B) Determination of the date on which a claim accrues

For purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—

(i) the date of the appointment of the Corporation as conservator or receiver; or

(ii) the date on which the cause of action accrues.

barred before the FSLIC was appointed as Bright Banc's conservator, and contend the RTC's actions accrued prior to February 10, 1987, and therefore the applicable two-year limitations period had expired prior to the FSLIC's appointment on February 10, 1989.

The RTC does not quarrel with defendants' assertion that claims already barred by limitations when the FSLIC becomes conservator cannot be revived, or with the proposition that Texas law applies a two-year limitations period for the claims in question. Instead, it contends the limitations period was tolled pursuant to the doctrine of adverse domination, the discovery rule, and fraudulent concealment,[6] and that these issues are inherently factual and cannot be resolved at the summary judgment stage. The RTC also argues that even if limitations has otherwise run, it has a federal-law claim for gross negligence pursuant to 12 U.S.C. § 1821(k), as to which the limitations period did not accrue until February 10, 1989, the date the FSLIC became Bright Banc's conservator.

## IV

The court considers first the RTC's contention that there is a genuine issue of material fact whether the limitations period was tolled pursuant to the doctrine of adverse domination.

## A

"Generally a statute of limitations begins to run against an action against directors of a corporation for malfeasance or nonfeasance from the time of the perpetration of the wrongs complained of. The doctrine of adverse domination, however, tolls the statute of limitations for as long as the corporate plaintiff continues under the domi-

nation of the wrongdoers." *Dawson,* 4 F.3d at 1308 (citations omitted). Under Texas law, which applies here, *see id.* at 1309, "[i]n order for limitations to run against a corporation's right of action against one of its own directors, two things must concur: (1) notice (2) to a disinterested majority of its board members." *Id.* at 1310 (quoting *Allen v. Wilkerson,* 396 S.W.2d 493, 500 (Tex.Civ. App.1965, writ ref'd n.r.e.)). Adverse domination is a "very narrow doctrine." *Id.* at 1312 (quoting *Shrader & York,* 991 F.2d at 227). It does not apply to "wrongdoing by a majority of the board [that] amounts to mere negligence." *Id.* This tolling principle is "limited to those cases in which the culpable directors have been active participants in wrongdoing or fraud, rather than simply negligent." *Id.* "[A] corporate plaintiff cannot toll the statute of limitations under the doctrine of adverse domination unless it shows that a majority of its directors was more than negligent for the desired tolling period." *Id.* at 1313 (footnote omitted). Accordingly, the RTC must raise a genuine issue of fact as to whether a majority of Bright Banc's board was composed of wrongdoers through February 10, 1987, two years prior to the FSLIC's appointment as Bright Banc's conservator. *See id.* at 1310.

Defendants argue that the RTC cannot present a genuine issue of material fact that a majority of Bright Banc's board of directors was composed of wrongdoers—that is, active participants in wrongdoing or fraud, rather than simply negligent—through at least February 10, 1987. They maintain there is no evidence that a majority of the board acted wrongfully in approving the merger with Dallas Federal, or allowing the transaction to be consummated, and that the RTC has admitted that a majority was not culpable.[7] Defendants also urge that they

---

**6.** As the court explains *infra* at § VI, it is not pellucid how seriously the RTC advances fraudulent concealment as a basis for tolling.

**7.** The RTC responded to Payne's Interrogatory No. 113 by stating:

Subject to ongoing discovery that may reveal additional culpable and non-culpable persons, RTC answers as follows:

The "culpable" directors, officers and persons comprising management are at least

Bright, Reeder and Payne. The "non-culpable" directors ... are all other directors ... from whom Bright, Reeder and Payne concealed the wrongs....

The parties quarrel concerning the effect of this response. *Compare* Bright/Reeder MPSJ at 17; Bright/Reeder Rep.Br. at 4–5 & n. 2; Payne MPSJ at 21; Bright/Reeder Rep. to Supp.Resp. at 1; and Tr. Oral Arg. at 76–77 *with* P.Resp. Bright/Reeder MPSJ at 6, 13. Given the qualified nature of the RTC's answer, it is not a

could not have adversely dominated Bright Banc because they comprised only a small minority of the board.

The RTC counters that summary judgment is not appropriate because: (1) *Dawson* does not mandate the "majority test" as the exclusive measure of domination, but permits domination in the form of actual control over an institution and its directors; (2) when a numerical majority of a board is not culpable, only the presumption of adverse domination is lost, and the RTC can still establish that a minority of the board or controlling shareholders exercised actual control, or superior power, over the institution; (3) there are genuine issues of material fact regarding whether a numerical minority exercised actual control of the institution; and (4) there are genuine fact issues as to whether a majority of the directors engaged in a level of wrongdoing sufficient to constitute adverse domination.[8]

### B

■ The court determines initially whether the adverse domination doctrine requires that there be a numerical board majority of wrongdoers in order for the limitations period to be tolled.

■ The RTC argues that *Dawson* did not decide whether there can be actual control by fewer than a numerical majority, and contends the policy rationale of *Dawson* supports an alternative approach that allows proof of actual domination. The court agrees with the RTC that when the Fifth Circuit addressed the adverse domination doctrine in *Dawson*, it did not resolve whether there must be a numerical board majority. *See Dawson*, 4 F.3d at 1309 (identifying the "three questions of paramount importance," none of which was whether there must be a numerical majority). As for the policy rationale, while it may seem counterintuitive for a

state to adopt an adverse domination rule with the intent of elevating substance over form, only to erect another formal barrier that ignores substance and thereby precludes invocation of the tolling principle, there is a countervailing interest. "[S]tatutes of limitations are themselves expressions of important legislative policies." *Id.* at 1311. Texas recognizes that limitations periods afford plaintiffs a reasonable time to present their claims, and protect defendants and the courts from the obligation "to deal with cases in which the search for truth may be seriously impaired by the loss of evidence" caused by lost witnesses and documents and fading memories. *Id.* at 1311–12 (quoting *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990)). Statutes of limitations "should not be judicially abrogated without due consideration of those policies." *Id.* at 1311.

To decide the question presented, the court must follow Fifth Circuit decisions and apply Texas law. After consulting *Dawson* and the controlling Texas case, the court rejects the RTC's arguments based on an "actual control" test, and its assertion that summary judgment cannot be granted due to genuine issues of material fact regarding whether a minority of the board or controlling shareholders actually controlled, or had superior power over, Bright Banc.

In *Dawson* the Fifth Circuit did not address whether a numerical majority is required for adverse domination, yet in its discussion of Texas law the panel appeared to assume a majority would be determined by a head count rather than by an analysis of actual control. *See id.* at 1310 ("Under the [majority test] approach, the plaintiff need not show that the wrongdoers completely dominated the corporation, but rather must show only that a majority of the board members were wrongdoers during the period the

binding admission and must be analyzed by the trier of fact to determine the weight to be given to it. This is not a determination to be made by this court at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

8. The RTC asserted in its initial response to Bright and Reeder's motion that discovery was needed to establish conclusively the culpable defendants' level of control, to determine what they knew, and to ascertain what Bright and Reeder concealed from the other directors. For the reasons already discussed, *see supra* at § II, the court declines to continue consideration of these motions.

plaintiff seeks to toll the statute."); *id.* (citing cases that "reason that the mere existence of a majority on the board" justifies tolling); *id.* ("The FDIC's burden, therefore, was to raise a genuine issue of fact as to whether a majority of [the failed bank's] board was composed of wrongdoers"); *id.* (agreeing with the FDIC's argument that there is no requirement that all culpable directors must be sued, but stating "although plainly the FDIC would still bear the burden of proving that a majority of the directors was culpable to obtain the benefit of the adverse domination doctrine"); *id.* at 1311 (referring to FDIC's decision to sue fewer than all directors, and still rely on adverse domination rule, as a choice "to sue less than a majority of the board"); *id.* ("the plaintiff still bears the burden of proving that a majority of the board consisted of wrongdoers for the relevant time period"); *id.* ("The district court incorrectly assumed that the adverse domination doctrine did not apply because the FDIC sued fewer than a majority of [the failed bank's] board of directors."); *id.* at 1312 (expressing the belief that Texas would not extend the adverse domination doctrine to "cases in which wrongdoing by a majority of the board amounts to mere negligence"); *id.* (noting that "it could almost always be said that when one or two directors actively injure the corporation, or profit at the corporation's expense, the remaining directors are at least negligent"); *id.* ("The facts of the instant case demonstrate that the adverse domination theory is inappropriate when the majority of the board is merely negligent."); *id.* ("there is no evidence to suggest that an organized majority coalesced to prevent any other parties from discovering the problems"); and *id.* at 1313 ("a corporate plaintiff cannot toll the statute of limitations under the doctrine of adverse domination unless it shows that a majority of its directors was more than negligent"). When the panel referred to a minority of the board, it also did so in numerical terms. *Id.* at 1310 (citing *Allen v. Wilkerson* for the proposition that the FDIC may sue fewer

than all allegedly culpable directors because *Allen* "plainly demonstrates that a plaintiff may sue only a minority of the board and still assert adverse domination to toll the statute of limitations under Texas law."). *Dawson* therefore can reasonably be understood to support a numerical interpretation of the majority test.[9]

The *Dawson* panel was attempting, of course, to predict how Texas law would resolve the adverse domination issues before it. *Id.* at 1309. In so doing it focused on *Allen* as the controlling Texas case. *Id.* at 1310. This court will likewise attempt to discern from *Allen* a guiding principle on the question whether a numerical majority is required under Texas law.

As will be seen, *Allen* did not explicitly decide what is meant by a majority of disinterested board members. The case did not involve allegations of wrongful conduct on the part of other directors. *Allen* dealt with a single culpable director's burden of proving his limitations defense, and did not explicitly address the tolling arguments (including adverse domination) of the plaintiff. Nevertheless, the *Allen* court's decision is consistent with this court's understanding of *Dawson* that the term "majority" means numerical majority.

*Allen* involved a garnishment action by a judgment creditor (through its receiver) of Leander Limestone Corporation (the "Corporation"). 396 S.W.2d at 496. The creditor could not collect from the Corporation, so it sought to garnish R.K. Allen ("Allen") for a debt he owed to the Corporation. At the time, Allen owned 80% of the capital stock, *id.* at 497, and was a member of the Corporation's four-man board of directors, *id.* at 500. Allen had withdrawn a total of $110,670.36 from the Corporation through a series of periodic advances. *Id.* at 499. The trial court entered judgment in favor of the creditor and against Allen following a bench trial. *Id.* at 496.

At the trial, Allen asserted the defense of limitations. *Id.* at 500. He posited on ap-

---

**9.** In a thorough opinion that addressed adverse domination under Pennsylvania law, the court in *RTC v. Farmer*, 865 F.Supp. 1143, 1156 (E.D.Pa. 1994), cited *Dawson* as one of the courts that had adopted the majority test. *Farmer* held that the test "requires the plaintiff to show that a *majority of the board members* were wrongdoers." *Id.* (emphasis added).

peal that the indebtedness, if any, that he owed to the Corporation was time-barred. *Id.* He argued that because the Corporation could not have recovered from him, the creditor likewise was precluded from obtaining judgment. *Id.*

The trial court did not enter findings of fact and conclusions of law. *Id.* at 496. The court of civil appeals therefore applied the Texas rule of law that presumes the trial court has resolved every disputed fact issue in favor of the appellee (here, the creditor) and that requires that the evidence be viewed in the light most favorable to the trial court's presumed findings, disregarding all that is to the contrary. *Id.* at 498–99.

Utilizing this standard of review, the appellate court turned to Allen's limitations defense. The court held that in order for limitations to have run as to the Corporation's cause of action against Allen, who was one of its directors, there must have been notice of Allen's wrongful conduct to a disinterested majority of the board members. *Id.* at 500. The court then analyzed the evidence to determine whether the record supported a finding of such notice and, in turn, the holding that the creditor's claim against Allen was not time-barred. *See id.* at 501 ("It thus appears that if the trial fact finder found any *one* of the following facts, such would be decisive against [Allen's] limitation plea[.]").

With respect to the notice component of the bipartite test, the appellate court appeared to require a numerical majority. The Corporation had four directors. Therefore, the court held, in order for limitations to run in favor of Allen—*i.e.,* to prevent the limitations period from being tolled—"it would be necessary for notice of his withdrawals from [the Corporation] to come to three disinterested members." *Id.* at 500. The court excluded Allen from this calculation "because of his obvious personal interest." *Id.* at 500–01. The court did not allow notice to Allen—an 80% shareholder whom the evidence showed owned the Corporation, had full control over the money, and could give singular orders that the bookkeeper would obey, *see id.* at 499—to be sufficient evidence. The court then analyzed the record and determined that the trial court could have found

that one or two other directors never had notice of Allen's withdrawals. *Id.* at 501. Significantly, it held that either finding alone "would be decisive against [Allen's] limitation plea." *Id.* A fair reading of this conclusion is that, because the Corporation had a four-member board, and Allen himself could not be considered disinterested, Allen had to prove notice to three of four directors in order to establish notice to a majority. So long as at least one other director lacked notice of Allen's withdrawals, the requisite notice to a board majority was lacking.

Regarding the element of disinterestedness, the court also appeared to take a numerical approach when it upheld the trial court by recognizing that it may have found that one or two of the remaining three directors (Allen's two brothers) were not disinterested. *Id.*

At this point in its opinion, the *Allen* court appears to have affirmed the trial court's judgment, notwithstanding the limitations defense, because the record supported a finding that Allen had not proved notice to a disinterested numerical majority of the Corporation's board of directors. The court then addressed Allen's argument that limitations had run against the Corporation because the fourth director, Chester Lankford ("Lankford"), who apparently was indisputably disinterested, could have maintained an action at any time to recover for the withdrawals, even though he was a minority stockholder. *Id.* The court rejected this contention because, while Lankford might have brought a shareholder's derivative action for recovery on a corporate cause of action, he could not have sued directly. *Id.* The claim belonged to the Corporation and was under the control of its board of directors. *Id.*

The court then entered the holding that the *Dawson* panel cited, *see* 4 F.3d at 1310, and that the RTC relies upon and emphasized at oral argument to support proof of actual domination by fewer than a numerical majority of a corporate board:

> And where, as here, the management of a corporation's affairs are de facto under the domination and control of the adversary of such cause of action, or the corporation is de facto powerless to sue on such cause of

action because of the lack of a disinterested majority of its board, mere notice to shareholders does not start running of limitations against the corporate cause of action.

*Allen,* 396 S.W.2d at 502.

This statement does not appear to undercut the *Allen* court's numerical analysis of the notice and disinterestedness elements. The court apparently was holding that, even if Lankford could have maintained a shareholder's derivative suit to recover Allen's withdrawals from the Corporation, the claim would not have been time-barred because notice to shareholders does not start the running of limitations when the corporation is de facto powerless to act. This is *dictum* in light of the court's holding that Lankford could not, as Allen asserted, have brought an individual action as a minority shareholder to recover for the withdrawn money. Moreover, had the court intended to apply this reasoning to Allen's limitations defense generally, it could have affirmed the trial court's judgment without first analyzing whether the evidence supported findings of a lack of notice to disinterested directors who constituted a numerical majority. It could simply have pointed to evidence such as that which showed that Allen was by far the largest shareholder, and that the company bookkeeper viewed him as *the* owner, and held the Corporation was "de facto under the domination and control of the adversary of such cause of action." Instead, the court followed the requirement of notice to a disinterested majority of the board, appeared to analyze both elements in numerical terms, and upheld the trial court judgment on the basis of evidence that supported the necessary findings.

On the basis of *Dawson* and Texas law, the court holds that the RTC is obligated to present a genuine issue of fact that a numerical majority of the Bright Banc board engaged in the requisite degree of culpable conduct.

**C**

The RTC argues that even if the conduct of a numerical majority is controlling, it has presented genuine issues of material fact regarding whether a board majority was more than merely negligent. According to the RTC, it has adduced evidence that a majority breached fiduciary duties or was grossly negligent, either of which is sufficient to trigger the adverse domination doctrine.

**1**

■ The RTC's assertion that a breach of fiduciary duty is sufficient to constitute the requisite culpability rests on the proposition that such a breach amounts to constructive fraud. *See* P. Resp. to Bright/Reeder MPSJ at 18 (citing *Stum v. Stum,* 845 S.W.2d 407, 415 (Tex.App.1992, no writ)). The court holds, however, that *Dawson*'s use of the term fraud does not include conduct that Texas law deems to be *constructive* fraud.

In *Dawson* the panel wrote:

> If adverse domination theory is not to overthrow the statute of limitations completely in the corporate context, it must be limited to those cases in which the culpable directors have been *active participants* in wrongdoing or fraud, rather than simply negligent.

*Dawson,* 4 F.3d at 1312 (emphasis added). The court interprets *Dawson* to restrict the universe of culpable fraudulent conduct to that which constitutes *actionable* fraud [10] rather than *constructive* fraud. While actionable fraud can fairly be categorized as that which is committed by "active participants in fraud," constructive fraud cannot.

■ Under Texas law, breach of fiduciary duty is constructive fraud by virtue of the breach of the duty itself. *See Stum,* 845 S.W.2d at 415 ("When an agent breaches his fiduciary duty, this act amounts to a fraud upon the principal."). Yet a corporate director can breach a fiduciary duty under

---

**10.** The elements for actionable fraud under Texas law are: (1) a material representation was made; (2) it was false when made; (3) the speaker knew it was false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result. *Beijing Metals & Minerals Import/Export Corp. v. American Business Ctr.,* 993 F.2d 1178, 1185 (5th Cir. 1993) (Texas law).

Texas law, and thus constructively commit fraud, by conduct that does not rise to the level of actionable fraud. There are three broad duties that stem from a director's fiduciary status: the duties of obedience, loyalty, and due care. *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 719 (5th Cir.1984). Each of these duties can be breached by acts or omissions that do not amount to actionable fraud. *See id.* at 719–721. For example, a director can breach the duty of obedience by committing an ultra vires act. *See id.* at 719. He can breach the duty of loyalty by diverting corporate assets to his own use. *Southwest Livestock & Trucking Co. v. Dooley,* 884 S.W.2d 805, 809 (Tex.App.1994, writ requested). "The [methods] for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale." *Imperial Group (Texas), Inc. v. Scholnick,* 709 S.W.2d 358, 363 (Tex.App. 1986, writ ref'd n.r.e.) (quoting *Guth v. Loft,* 23 Del.Ch. 255, 5 A.2d 503, 510 (1939)). Under the *analysis* of *Stum* and like cases, however, such conduct would amount to constructive fraud.

*Dawson* appears to foreclose this expansive approach to the concept of fraud in the context of the adverse domination doctrine. As the panel held when addressing "mere negligence,"

> it could almost always be said that when one or two directors actively injure the corporation, or profit at the corporation's expense, the remaining directors are at least negligent for failing to exercise every precaution or investigation.

*Dawson,* 4 F.3d at 1312 (citation and quotation marks omitted). Similarly, "it could almost always be said" in the same circumstances that the directors breached their fiduciary duties to the corporation.

To hold constructive rather than actionable fraud to be sufficient to trigger adverse domination would, in the words of *Dawson,* "effectively eliminate the statute of limitations in all cases involving a corporation's claims against its own directors." *Id.* The court therefore declines to hold that conduct that is merely constructively fraudulent, and not actionably fraudulent, is sufficient for adverse domination.

Of course, conduct that constitutes actionable fraud and that also amounts to a breach of fiduciary duty is adequate. In the present case, however, the RTC has not adduced summary judgment evidence that would permit a reasonable trier of fact to find actionable fraud on the part of a majority of Bright Banc's directors.[11]

2

The RTC also asserts that the directors were grossly negligent.

In *RTC v. Acton,* 844 F.Supp. 307, 317 (N.D.Tex.), *appeal docketed,* No. 94–10375 (5th Cir.1994), Chief Judge Sanders relied on *Dawson* to hold that grossly negligent conduct "does not amount to the 'active participation in wrongdoing or fraud' that the Fifth Circuit required for application of adverse domination tolling." (citing *Dawson,* 4 F.3d at 1312). It is possible the Fifth Circuit will ultimately decide this question.[12] In the meantime, federal district judges have reached differing conclusions. *Compare Acton,* 844 F.Supp. at 317, *with FDIC v. Henderson,* 849 F.Supp. 495, 499 (E.D.Tex. 1994) (gross negligence is basis for establishing that majority of board was adversely dominated).

The court will assume *arguendo* that grossly negligent conduct by a majority of

---

11. The RTC relies on an expert report submitted with its January 5, 1995 application for leave. The expert opines that the Bright Banc board breached its fiduciary duties as follows:

(1) they ignored their fiduciary duties in a grossly negligent manner by not responding to criticisms of the FHLB–Dallas to their Texas Federal underwriting; and (2) they failed to discover the concerns of Dallas Federal's general counsel, in which he severely criticized Dallas Federal's commercial loan underwriting in a September 1984 letter. Neither of these omissions amounts to actionable fraud.

12. At oral argument the court was advised that the sole issue the RTC has presented on appeal in *Acton* is whether gross negligence constitutes a sufficient degree of culpability to permit application of the adverse domination doctrine under *Dawson. See* Tr.Oral Arg. at 39.

directors can, in certain circumstances, toll limitations under the adverse domination doctrine. Nevertheless, the court holds in the present case that the RTC has not presented evidence that would permit a reasonable trier of fact to find the necessary type of grossly negligent conduct.[13] Therefore, it has not demonstrated the requisite level of culpability for adverse domination.

■ In *Dawson* the Fifth Circuit predicted that Texas law would restrict the "very narrow" adverse domination doctrine "to those cases in which the culpable directors have been *active* participants in wrongdoing or fraud, rather than simply negligent." *Dawson*, 4 F.3d at 1312 (emphasis added). District judges addressing this issue in the wake of *Dawson* have grappled with its language in an attempt to determine where the circuit will set the standard. *See Acton*, 844 F.Supp. at 317; *Henderson*, 849 F.Supp. at 498–99 (interpreting *Dawson* and *RTC v. Seale*). The court does not intend in today's case to fashion a rule of law on the strength of one sentence taken from *Dawson*. What *Dawson* teaches is larger. Without addressing "precisely how culpable a majority of directors must be before adverse domination tolling is available," 4 F.3d at 1313 n. 4, the opinion nevertheless instructs that Texas courts will not extend adverse domination tolling where to do so would risk eliminating the statute of limitations in all cases involving a corporation's claims against its own directors, *id.* at 1312. In illustrating this proposition, the *Dawson* panel contrasts merely negligent directors who fail to exercise every precaution and investigation, with

those who "actively injure the corporation, or profit at the corporation's expense." *Id.*

■ This distinction supports the principle that certain grossly negligent omissions, including failures to exercise every precaution and investigation, are likewise inadequate. Under Texas law, gross negligence can be committed either by act or omission. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 21 (Tex.1994). By definition, an omission is a failure to act. Therefore, a majority of directors can be grossly negligent under Texas law without undertaking a single affirmative act to injure the corporation. Gross negligence differs from ordinary negligence in that the actor must be consciously indifferent and his conduct must create an extreme degree of risk. *See id.* These factors, alone or in combination, do not make grossly negligent omissions an "active" injury to a corporation when merely negligent omissions would not be. Therefore, the conduct itself must be examined. The fact that a malfeasant director was grossly negligent because he failed to act, does not alone make him an active participant in wrongdoing or fraud within the meaning of *Dawson*.

The summary judgment record does not contain evidence that would permit a reasonable trier of fact to find that a majority of the Bright Banc board was grossly negligent in a manner that amounted to active participation in wrongdoing or fraud. The RTC relies upon the board's approval of the Dallas Federal merger in the face of several "red flags." *See* P.Resp. to Bright/Reeder MPSJ at 18 ("Here, the directors actively engaged in wrongdoing by approving the denuding of Bright Banc's assets.");[14] P.Resp. to Payne

---

13. Defendants argue that the RTC cannot establish gross negligence under the "actual, subjective awareness" standard that applies in Texas. *See Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). The court has carefully examined the summary judgment record. The RTC's evidence would permit a reasonable trier of fact to find actual, subjective awareness under a circumstantial evidence standard. *See id.* ("We hereby reaffirm our holding that the defendant's subjective mental state can be proven by direct or circumstantial evidence."); *id.* (Texas Supreme Court reaffirms use of circumstantial evidence, "[r]ecognizing the practical difficulty of producing direct evidence of conscious indifference short of the defendant's admission").

Although defendants appear to view *Moriel*'s subjective component as enhancing their ability to obtain summary judgment, the contrary may be true. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 815–18, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982) (abandoning subjective component of qualified immunity defense and recognizing that subjective element had proved incompatible with Rule 56 motions).

14. The examples the RTC provides of grossly negligent conduct (the drunk surgeon and the speeding driver in a school zone) are both grossly negligent acts rather than omissions. *See id.* at 17.

MPSJ at 8 ("RTC has produced much evidence that shows that a majority of Bright Banc's board were grossly negligent in approving the Dallas Federal merger without adequate due diligence."). In the expert report submitted on January 5, 1995, the RTC's expert witness opines that it was grossly negligent for the Bright Banc board of directors: (1) to pay the sum of $107.3 million in cash for Dallas Federal, and in so doing to acquire virtually all the problem assets that ultimately caused the failure of Bright Banc, while simultaneously removing approximately the same amount in interest-earning assets; (2) to ignore the implications of the deteriorating commercial real estate markets for the Dallas Federal portfolio; (3) not to respond to FHLB–Dallas criticisms of the Texas Federal underwriting by redoubling their due diligence scrutiny of Dallas Federal; (4) to rely on Dallas Federal internal review forms for due diligence investigation of the Dallas Federal portfolio; and (5) to use the RCA to purchase Dallas Federal stock instead of exercising rights under the Merger Agreement.

What the RTC characterizes as active participation is what the evidence shows are omissions. The RTC relies upon several failures to act, which fall within the rubric of not conducting an adequate due diligence investigation despite problems that had arisen from the Texas Federal acquisition; concerns about Dallas Federal (the increasing number of scheduled items, the number of soft loans, concerns about management, the SEC investigation); and a deteriorating real estate economy. *See* P.Resp. to Payne MPSJ at 7, 9–12. The RTC also contends the board was grossly negligent because it paid too much for Dallas Federal, and acquired the problems that caused Bright Banc to fail, and because it entered into the RCA. Viewing the evidence favorably to the RTC, and assuming that a trier of fact reasonably could find this conduct to be gross negligence, the proof shows that a majority of directors—in *Dawson*'s words—"fail[ed] to exercise every precaution or investigation" while "one or two directors actively injure[d] the corporation, or profit[ed] at the corporation's expense." *Dawson*, 4 F.3d at 1312 (internal quotation marks omitted). This conduct, even if grossly negligent, is insufficient to toll limitations under the adverse domination doctrine.[15]

Accordingly, the court holds that the RTC has not avoided the statute of limitations on the basis of adverse domination.

## V

The court next considers the RTC's assertion that the limitations period was tolled pursuant to the discovery rule.

## A

Defendants move the court to reject this exception to the time bar, contending the RTC cannot adduce evidence that the Bright Banc board did not discover, or through the exercise of reasonable diligence could not have discovered, the nature of the injury prior to February 10, 1987. Defendants argue that they have produced proof on the basis of which a reasonable trier of fact could only find against the RTC.

The RTC counters that the record supports a finding that the discovery rule applies, and that there is a genuine issue of material fact. In Disputed Issues of Fact Nos. 23, 24, 25, 26, and 52, the RTC cites the court to evidence that the directors who approved the merger with Dallas Federal constituted a majority of the board in 1987 and 1988; at no time between January 1986 and March 1987 did the board minutes reflect any discussion regarding a claim or potential lawsuit against defendants or the other directors arising from the Dallas Federal acquisition; although losses were occurring, Reeder and Bright Banc's chief financial officer reported to federal examiners that they expected profitable operations by mid–1986; in November and December 1987 Bright Banc's counsel prepared memoranda regarding potential litigation against directors and

---

15. The court is not holding, of course, that directors who are grossly negligent in this manner cannot be held liable under applicable law when an action is timely prosecuted against them. Rather, the court is concluding that this type of grossly negligent conduct is insufficient to toll limitations under the adverse domination doctrine.

officers of Dallas Federal, supporting the inference that any claims resulting from the acquisition were not discovered (or, alternatively, that the board was not aware of such claims) until November 1987; and defendants' reliance on the March 1986 Arthur Young report is misplaced because it is inconsistent with Bright's testimony. The RTC contends there is no evidence that a disinterested majority of directors discovered or was put on notice of the claims.

B

 Under Texas law, limitations is an affirmative defense on which defendants have the burden of proof. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex. 1988). The discovery rule is a tolling doctrine as to which the RTC has the burden. *See Shrader & York,* 991 F.2d at 220 (Texas law). To avoid summary judgment, the RTC, as the party with the burden, must adduce evidence that creates a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). There is no genuine issue of fact where the record, taken as a whole, could not lead a rational trier of fact to find for the RTC. *See James by James v. Sadler,* 909 F.2d 834, 836–37 (5th Cir.1990).

 The court holds that a reasonable trier of fact could not find that the discovery rule tolled the running of the limitations period through February 10, 1987. As an initial matter, it is difficult to square the RTC's discovery rule analysis with its assertion that a numerical majority of the Bright Banc board was grossly negligent. If a majority of the board had actual, subjective awareness sufficient to constitute gross negligence under Texas law, it apparently knew of the injuries to Bright Banc well in advance of February 10, 1987. Defendants aptly observe that the RTC "simply meets itself coming the other way" when it urges gross negligence but posits the board was not on notice of the facts giving rise to the Dallas Federal claims. *See* Bright/Reeder Rep.Br. at 7–8. Nevertheless, because the RTC may advance alternative theories, the court will address its discovery rule argument.

Defendants have adduced summary judgment evidence that reflects the Bright Banc board was well-aware of problems associated with the Dallas Federal acquisition considerably in advance of February 10, 1987. *See, e.g.,* Bright/Reeder MPSJ at 6–9 (Undisputed Fact No. 13(A)–(K)). Illustrative of their knowledge is the Arthur Young report and the December 1986 letter from the Bright Banc board to FHLB–Dallas. *See* Undisputed Fact No. 13(D) and (I). The RTC's counsel recognized at oral argument that the Bright Banc board, within a month of approving the Dallas Federal merger, told the FHLBB "we're acutely aware of these problems, we know what these problems are." Tr. Oral Arg. at 86.

 The RTC attempts to counter this evidence by offering Bright's testimony that the Arthur Young report did not surprise the directors, and Payne's testimony that neither the report nor board letter led him to suspect that a claim existed. *See* P.Supp.Resp. at 4–5 (Disputed Fact No. 52). But this is not the only standard for application of the discovery rule. This doctrine examines both what is known and what through the exercise of reasonable diligence could have been discovered by a non-culpable person with authority to bring the action. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). On the basis of the second component of the test, the court holds that a reasonable trier of fact presented with the summary judgment evidence could not find in favor of the RTC on the discovery rule argument. The RTC has not therefore adduced a *genuine* issue of material fact, and summary judgment is warranted.

VI

 Defendants also move for summary judgment precluding the RTC from avoiding the limitations bar on the ground of fraudulent concealment.

It is not clear whether the RTC is seriously attempting to defeat the limitations defense on this basis. Bright and Reeder raised this tolling argument in their summary judgment motion, *see* Bright/Reeder MPSJ at 22–23, but the RTC did not explicitly respond to it. *See* Bright/Reeder Rep.Br.

at 3 n. 1.[16] Similarly, Payne addressed fraudulent concealment in his motion, *see* Payne MPSJ at 23–25, and the RTC did not expressly reply to his argument. *See* Payne Rep.Br. at 4 n. 3. The RTC did not argue fraudulent concealment in its supplemental response. *See* Bright/Reeder Rep.Supp. Resp. at 6. Yet at oral argument, the RTC mentioned fraudulent concealment, *see* Tr. Oral Arg. at 84; stated that discovery had adduced new facts that might trigger fraudulent concealment, *id.* at 92; and suggested that genuine issues under that doctrine would toll the limitations period, *id.* at 93.

Regardless whether the RTC advances this argument with any real hope of success, its position is meritless. A reasonable trier of fact could not find, as required by Texas law, that the wrongdoers actually concealed the facts regarding the wrong. The record reflects, for the reasons the court has explained in addressing the discovery rule, that the other directors were aware of any improper conduct. The RTC has not presented a genuine issue of fact with regard to fraudulent concealment.

### VII

■ The court now addresses the RTC's contention that its federal-law action for gross negligence is not time-barred.

The RTC maintains that even if its state-law claims are precluded by limitations, its federal-law gross negligence action, brought pursuant to 12 U.S.C. § 1821(k), did not accrue until the FSLIC was appointed as conservator, and the action was therefore brought within the three-year limitations period prescribed by FIRREA.

Section 1821(k) provides a federal statutory gross negligence standard of liability for officers and directors of federally-insured depositary institutions. *RTC v. Miramon*, 22 F.3d 1357, 1364 (5th Cir.1994). Section 1821(k) empowers the RTC to bring a cause of action under this gross negligence standard. *Id.* at 1361.

As the court has already noted, the Fifth Circuit has consistently interpreted FIRREA as not reviving stale claims. *See Seale,* 13 F.3d at 854; *Shrader & York,* 991 F.2d at 220; *Belli,* 981 F.2d at 842. In *Seale* the court rejected an attempt by the RTC to resurrect, under FIRREA's statute of limitations, state-law claims that were already time-barred under state law as of the date the RTC became conservator. *Seale,* 13 F.3d at 854. The panel held that "this approach would permit the RTC to resurrect claims stale from the early twentieth century. The evidence that Congress intended such a sweeping recovery is not persuasive." *Id.* at 853. Nor, in this court's view, is the evidence convincing that Congress intended by § 1821(k) to create a gross negligence cause of action that effectively revived time-barred state-law gross negligence claims. The court therefore predicts that the Fifth Circuit will follow the approach of the Eleventh Circuit in *RTC v. Artley,* 28 F.3d 1099, 1102 (11th Cir.1994), in which the court declined to interpret § 1821(d)(14)(B) to permit accrual of a federal cause of action for gross negligence when a state statute of limitations would have barred a gross negligence suit.

Because the court has already held that the RTC's claim for gross negligence was barred by limitations under state law prior to the date the FSLIC was appointed as Bright Banc's conservator, the court holds the RTC's § 1821(k) gross negligence claim based on federal law is also time-barred.

\* \* \* \* \* \*

Defendants' motions for partial summary judgment are granted, and counts VI, VII, and VIII of the RTC's second amended complaint, in which they allege claims for negligence, gross negligence, breach of fiduciary duty, and aiding and abetting breach of fiduciary based on Bright Banc's acquisition of

---

**16.** In its request for Rule 56(f) relief, the RTC stated that it needed additional discovery to determine "whether the defendants actively concealed from the directors the condition of Dallas

Federal at the time of its acquisition," P.Resp. to Bright/Reeder MPSJ at 3, but this assertion was made as a specific example of the need for dis-

Dallas Federal, are dismissed with prejudice.[17]

**SO ORDERED.**

covery concerning adverse domination and the discovery rule, *id.* at 2.

17. To the extent the decision the court reaches today is inconsistent with its March 31, 1993 memorandum opinion and order denying Bright and Reeder's motion to dismiss based on Fed. R.Civ.P. 12(b)(6), the court observes that the standards that govern motions addressed to the adequacy of pleadings to state a claim are materially different from the ones that apply to summary judgment motions. Moreover, the court issued its decision prior to the Fifth Circuit's opinion in *Dawson*, and is now guided by its reasoning.