The **FEDERAL DEPOSIT INSURANCE CORPORATION, in its Separate Corporate Capacity and as Receiver of Ingram State Bank, Plaintiff,**

v.

**Charles SCHREINER, III, et al., Defendants.**

**Civ. No. SA–93–CA–674.**

United States District Court, W.D. Texas, San Antonio Division.

June 16, 1995.

Steven K. DeWolf, Ronquillo & DeWolf, L.L.P., Dallas, TX, David Mace Roberts, Ronquillo & DeWolf, L.L.P., Dallas, TX, for F.D.I.C.

William H. Oliver, Drought & Pipkin, L.L.P., San Antonio, TX, for Charles Schreiner, III.

George H. Spencer, Clemens, Spencer, Welmaker & Finck, San Antonio, TX, for Raymond F. Barker.

Lavern D. Harris, Harris & Harris, P.C., Kerrville, TX, for H. Dale Priour, Jack Clarke, Jr.

Frederick C. Shannon, Jr., Mitchell L. Weidenbach, Shannon, Weidenbach & Estee, Inc., San Antonio, TX, for Jasper Moore, Jr.

Keith E. Kaiser, Cox & Smith Inc., San Antonio, TX, Steven H. Thomas, Law Offices of Steven H. Thomas, Dallas, TX, for Jane Flato Smith.

M. Scott Stehling, Kerrville, TX, for Charles H. Johnston.

## ORDER

SUTTLE, Senior District Judge.

Pending before the Court is the Motion to Reconsider Defendant's Motion to Dismiss filed by defendant Jasper Moore, Jr. on April 18, 1995 and joined in by defendants Charles H. Johnston, Jane Flato Smith, Charles Schreiner, III, H. Dale Priour, and Raymond F. Barker.[1] The Federal Deposit Insurance Corporation (hereinafter "FDIC") filed its opposition to the motion on April 28, 1995. Therefore the matter is ripe for resolution.

### I. Background

In its Order dated March 24, 1994[2], the Court addressed, *inter alia*, the various motions of the defendants to dismiss the FDIC's claims as time-barred under the applicable Texas statute of limitations.[3] Defendants relied primarily on *RTC v. Acton*, 844 F.Supp. 307 (N.D.Tex.1994) to support their motions. The FDIC argued that its claims were timely filed by virtue of the application of the Texas tolling provision known as the adverse domination doctrine. Finding that *Acton* failed to adequately discuss the Fifth Circuit's recently issued opinion in *RTC v. Seale*, 13 F.3d 850 (5th Cir.1994), the Court instead relied on U.S. Dist. Judge Steger's decision in *FDIC v. Henderson*, 849 F.Supp. 495 (E.D.Tex.1994) to hold that the FDIC qualified for application of the adverse domination doctrine by virtue of its claim that the former directors had engaged in gross negligence. Accordingly, the Court denied the defendants' motions to dismiss the FDIC's remaining two claims of gross negligence and breach of fiduciary duty as time-barred.

On April 4, 1995, the Fifth Circuit issued its decision in *RTC v. Acton*, 49 F.3d 1086 (5th Cir.1995). Arguing that *Acton* represents new controlling authority, defendants urge the Court to revisit the issue of limitations. The FDIC opposes reconsideration on the ground that *Acton* does not represent a change in the law but merely clarifies the Fifth Circuit's earlier opinion in *RTC v. Seale, supra.*

### II. Jurisdiction

■ This Court has jurisdiction to entertain the instant motion to reconsider the motions to dismiss despite the pendency of the interlocutory appeal of its order of February 16, 1995.[4]

### III. Analysis

■ As noted, the defendants ask the Court to reconsider and reverse its order denying their motions to dismiss the FDIC's claims as time-barred on the strength of *RTC v. Acton, supra.* By defendants' calculations, the FDIC's claims as to all but a handful of the subject loans would be time-barred if the Court reads *Acton* to hold that gross negligence does not suffice to trigger adverse domination. The FDIC, on the other hand, contends that *Acton*, like *Seale*, requires only that a plaintiff plead active participation in wrongdoing or fraud by the defendants to qualify for tolling via the ad-

---

1. The motions which the defendants ask the Court to reconsider are the Motion to Dismiss Plaintiff's First Amended Complaint filed by defendant Johnston on February 1, 1994 and the similar motions filed by defendants Priour, Barker, Smith, Moore, Schreiner and Clarke on February 3, 1994.

2. Docket No. 91.

3. Prior to ruling on the limitations issue, the Court granted the defendants' motion to dismiss the FDIC's claims of negligence and negligence *per se* for failure to state a claim.

4. *See Royal Insurance Company of America v. Quinn–L Capital Corporation*, 3 F.3d 877 (5th Cir.1993) (holding that district court loses jurisdiction only over all matters validly before a court of appeals); *Taylor v. Sterrett*, 640 F.2d 663 (5th Cir.1981) (general rule is that a district court is divested of jurisdiction on filing of notice of appeal with respect to any matters involved in the appeal; however, where appeal is allowed from an interlocutory order, the district court may still proceed with matters not involved in the appeal).

verse domination doctrine. The requisite proof of wrongdoing by defendants has been satisfied, the FDIC maintains, through its proffer of summary judgment evidence detailing the defendants' active and continual violation of Federal Regulation O. Understanding the holding of *Acton* and its relevancy to the issue under consideration necessarily entails a retracing of the recent evolution and development of the adverse domination doctrine in the Fifth Circuit in the context of cases involving claims by the FDIC or one of its counterparts against former directors of a failed financial institution.

In *F.D.I.C. v. Dawson*,[5] the Fifth Circuit first addressed the issue of the minimum showing a plaintiff must make to establish its entitlement to the adverse domination doctrine under Texas law. Specifically, the issue, as phrased by the *Dawson* court, was "whether Texas law would allow a plaintiff to establish the adverse domination doctrine by proving that a majority of a corporation's directors was merely negligent." 4 F.3d at 1311.[6] Finding no Texas case in which the adverse domination doctrine had been invoked based on the mere negligence of a majority of a corporation's directors, the Fifth Circuit consulted the law of other circuits to shed light on how a Texas court would decide the issue. Declining to follow a line of district court cases which had liberally applied the doctrine in cases where the RTC had alleged some form of negligence by a majority of the board of directors, the Fifth Circuit concluded that, under Texas law, a corporate plaintiff could not toll the statute of limitations under the doctrine of adverse domination unless it shows that a majority of its directors was more than negligent for the desired tolling period. 4 F.3d at 1313. Al-

though holding that mere negligence would not suffice for adverse domination tolling, the Fifth Circuit withheld any ruling on the issue of precisely how culpable a majority of directors must be for adverse domination tolling to apply. 4 F.3d at 1313 n. 4.

The Fifth Circuit next addressed the adverse domination tolling issue in *RTC v. Seale*.[7] In *Seale*, the trial court granted the defendant director's motion for summary judgment, finding that the RTC's claims for breach of fiduciary duty and gross negligence were time-barred. On appeal, the Fifth Circuit, after reviewing the district court's finding of no adverse domination de novo, affirmed the district court's judgment. In doing so, it observed:

> The RTC has not created any fact issues of regulatory violations or fraud, concealment, or other illegal activity amounting to more than negligence. *The RTC argued gross negligence, but provided no more than conclusory assertions in support. It offered nothing to support a finding that a majority controlled the Jasper board in a more than negligent way.*

13 F.3d at 854–55 (emphasis added). As this Court explained in its order of March 24, 1995, the emphasized language in this passage from *Seale* could be read to mean that the Fifth Circuit would have found that the RTC would have been entitled to submit the issue of adverse domination to the jury if its summary judgment evidence had raised an issue of fact as to whether the board had been grossly negligent in their management of the bank.[8]

The most recent Fifth Circuit opinion grappling with the adverse domination issue was published in April of this year in *RTC v. Acton, supra.* In *Acton*, the district court

---

5. 4 F.3d 1303 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994).

6. The issue was thus framed because the summary judgment evidence presented by the FDIC at the trial level only raised an issue of fact as to whether the bank board's directors had been negligent in supervising the lending practices of one of the loan officers, but presented no evidence that they were active participants in wrongdoing or fraud. 4 F.3d at 1311.

7. 13 F.3d 850 (5th Cir.1994).

8. As explained in its order, the Court based this interpretation of *Seale* on the opinion issued by Senior U.S. Dist. J. Steger in his order of March 9, 1994 in *F.D.I.C. v. Henderson*, 849 F.Supp. 495 (E.D.Tex.1994). At least one other district court referenced *FDIC v. Henderson* in concluding that grossly negligent conduct by a majority of directors could, in certain instances, toll limitations under the adverse domination doctrine. *See R.T.C. v. Bright*, 872 F.Supp. 1551, 1566–67 (N.D.Tex.1995).

granted the defendants' motion for summary judgment, finding that gross negligence is a degree of negligence for statute of limitations purposes. *Acton*, 844 F.Supp. at 317. On appeal, the Fifth Circuit viewed the issue as being whether gross negligence was sufficiently more than simple negligence to encompass the requirement under *Dawson* that the directors have been active participants in wrongdoing or fraud.

Initially, the *Acton* court noted that the statutory definition of gross negligence,[9] unlike the common law definition of gross negligence,[10] contains a subjective component which renders it akin to criminal recklessness. 49 F.3d at 1091. However, because it lacks an element of intent, the *Acton* court found that the difference between gross negligence and negligence is one of degree, not kind. Even so, this difference was insufficient to elevate gross negligence to the level of conduct required by *Dawson*. As explained by the appellate court:

> *Dawson* requires intentional conduct. The words "active participants in wrongdoing or fraud" are more consistent with intentional conduct than with negligent conduct. The fact that the *Dawson* court required not only fraudulent conduct or wrongdoing but also "active participation" therein is significant.

49 F.3d at 1091. This, when combined with the *Dawson* court's rejection of the liberal application of the adverse domination doctrine by the district courts, implied to the *Acton* court that "some sort of self-dealing or fraudulent conduct is required *and* that the level of culpability associated with that conduct is distinct from gross negligence." *Id.* (emphasis added). In other words, the self-dealing or fraudulent conduct must be more than negligent or grossly negligent to satisfy

the "active participation in wrongdoing or fraud" standard of *Dawson*. *Id.*

Prior to issuing its holding, the *Acton* court paused to recognize that the *Seale* decision could be construed, as both this Court and the court in *Henderson* had done, to mean that gross negligence is sufficient to trigger adverse domination tolling. However, because the *Seale* court merely found that the RTC's summary judgment proof was comprised of only conclusory assertions inadequate to defeat the defendants' summary judgment motion and therefore never reached the issue of whether in fact gross negligence would suffice for purposes of adverse domination tolling, the *Acton* court found *Seale* not controlling on the issue before it.

As mentioned earlier, the FDIC's resistance to the motion for reconsideration is premised on its belief that the standard announced in *Acton* for invoking the adverse domination doctrine is the same standard set forth in *Seale* and therefore provides no basis for revisiting the limitation issue. However, this reading of *Acton* is unacceptable in light of the *Acton* court's express finding that the *Seale* decision was confined to simply conducting a de novo review of the district court's granting of summary judgment to the defendant directors due to the RTC's failure to adduce competent evidence to create an issue of fact on the limitation issue and, consequently, was not binding on the *Acton* court. *Acton*, as this Court reads it, represents a clarification by the Fifth Circuit of what it meant in *Dawson* in holding that the defendant directors must be "active participants in wrongdoing or fraud". Not only does it affirmatively resolve the unsettled question of whether "active participation" embraces an element of intent, it also dispels

---

9. In 1987, the Texas Legislature modified the *common law definition of gross negligence* as follows:

"Gross negligence" means more than momentary thoughtlessness, inadvertence or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.

TEX.CIV.PRAC. & REM.CODE ANN. § 41.001(5).

10. The Texas common law definition of gross negligence is

that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

*Burk Royalty v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981).

any uncertainty concerning the adequacy of grossly negligent conduct for purposes of tolling limitations under the adverse domination theory. Consequently, the Court is persuaded that *Acton* represents a change in the law by which the defendants' motions to dismiss must be reevaluated.

■ Accordingly, it is ORDERED that the defendants' motions to reconsider be, and the same are hereby, GRANTED. This leaves only the question whether the FDIC has satisfied the standard set out in *Dawson* and clarified by *Acton* for avoiding dismissal of its claims on limitation grounds.

Two important facts weigh heavily against the FDIC in the decision of this issue. First, the FDIC has entered a judicial admission that it is not alleging any fraud or dishonesty by the defendants.[11] Second, the only claims surviving the Court's order of March 24, 1995 are those of gross negligence and breach of fiduciary duty.[12] Nevertheless, the FDIC maintains that it alleged and produced evidence that the defendants were active participants in wrongdoing and continual violations of Federal Regulation O.[13] Such showing, it contends, satisfies the *Dawson* and *Acton* standard. However, as explained below, these very documents, when reviewed in the light of *Dawson* and *Acton,* not only do not accomplish their intended objective, but, ironically, serve instead to defeat it.

In its supporting memorandum filed in response to Jane Flato Smith's Motion to Dismiss, or in the Alternative, for Summary Judgment the FDIC argues that the "Defendants actions in this matter were more than negligent. Their actions were *grossly negligent.*"[14] Similarly, the FDIC later claims that "the evidence before this Court clearly establishes that Smith's actions were *grossly negligent* as a matter of law,"[15] that "[t]he uncontroverted facts clearly establish that Smith's actions were *grossly negligent*,"[16] and that "the overwhelming evidence stated herein, and with more specificity, in the Affidavit of William Carden,[17] demonstrates, without a doubt, that Smith's actions were *grossly negligent.*"[18] Likewise, the FDIC's supporting memorandum in response to the other defendants' motions to dismiss the FDIC's First Amended Complaint contains similar language. Therein the FDIC alleges that the "Defendants actions in this matter were more than negligent. Their actions were *grossly negligent.*"[19] Later, it argues that "[t]he facts plead, when taken as true as required by Texas law, definitely support the

---

**11.** *See* Transcript of Rule 16 Hearing, November 24, 1993, p. 28. As it explained to counsel at the Rule 16 hearing, the Court's inquiry was prompted by its reading of the opinion of the Fourth Circuit Court of Appeals in *F.D.I.C. v. Cocke,* 7 F.3d 396 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 53, 130 L.Ed.2d 12 (1994) (noting that the Virginia Supreme Court, in construing the doctrine of equitable estoppel codified in Va.Code Ann. § 8.01–229(D) (Michie Supp. 1993), required intentional conduct to allow the doctrine to toll the running of a statute of limitations), which the Court thought might presage the ruling of the Fifth Circuit on the issue of adverse domination tolling.

**12.** The Court's order of March 24, 1995 granted the defendants' motions to dismiss the FDIC's claims of negligence and negligence per se for failure to state a claim under Texas law.

**13.** Specifically, the FDIC cites the Court to the following documents:

    1. FDIC's Memorandum in Support of FDIC's Opposition to Jane Flato Smith's Motion to Dismiss, or in the Alternative, For Summary Judgment, pp. 13–23.

    2. FDIC's Memorandum in Support of FDIC's Opposition to Defendants' Motions to Dismiss, pp. 12–23.

    3. FDIC's Opposition to Defendants' Motions For Summary Judgment with Supporting Brief and attached evidence.

**14.** *See* Memorandum in Support of Plaintiff FDIC's Opposition to Defendant Jane Flato Smith's Motion to Dismiss First Amended Complaint, or, in the Alternative for Summary Judgment, p. 15 (emphasis added).

**15.** *Id.* at p. 21 (emphasis added).

**16.** *Id.* at p. 22.

**17.** Dr. Carden's affidavit, as discussed later, provides perhaps the most telling evidence against the FDIC's effort to avoid dismissal of its claims on limitation grounds.

**18.** *Id.* at p. 23 (emphasis added).

**19.** *See* FDIC's Memorandum in Support of Plaintiff FDIC's Opposition to Defendants Motions to Dismiss First Amended Complaint, p. 12 (emphasis added).

FDIC's claims for *gross negligence.*" [20] Nowhere in either of these documents does the FDIC allege any intentional wrongdoing by the defendants.

The affidavit of Dr. William Carden, the primary document on which the FDIC relies to counter the defendants' motions to dismiss and for summary judgment, offers the most compelling proof that the FDIC has not satisfied the "active participation in wrongdoing or fraud" standard of *Dawson* and *Acton.* Dr. Carden, who describes himself as the President and Chief Executive Officer of The Carden Group, a Waco-based strategic planning and market research consulting firms that specializes in the financial services industry, and the President of BanCompliance Systems, Inc., a company that offers financial institutions a variety of regulatory compliance services,[21] is offered by the FDIC as an expert on the operation and management of banks in compliance with federal banking statutes and regulations. Based on what appears to have been a thorough and comprehensive review of the FDIC's evidentiary documents,[22] Dr. Carden stated that "it is my

20. *Id.* at p. 19 (emphasis added).

21. *See* Affidavit of Dr. William Carden, p. 2, attached as Exhibit E to FDIC's Opposition to Defendants' Motions for Summary Judgment.

22. According to Dr. Carden, the opinions expressed in his affidavit were formulated from his review of the following documents:
   a. Plaintiff's Original and Amended Complaint;
   b. Minutes of the board of Directors of the Chas. Schreiner Bank for the period from February 21, 1985 to April 19, 1990;
   c. Minutes of the Annual Stockholders Meeting of Chas. Schreiner Bank of February 14, 1985 and April 10, 1986;
   d. Regulatory Examination Reports:
      1) State of Texas Department of Banking of 1973,
      2) State of Texas Department of Banking of 1974,
      3) State of Texas Department of Banking of 1975,
      4) State of Texas Department of Banking of 1976,
      5) State of Texas Department of Banking of 1977,
      6) State of Texas Department of Banking of 1979,
      7) State of Texas Department of Banking of 1980,
      8) State of Texas Department of Banking of 1985,
      9) State of Texas Department of Banking of 1988,
      10) State of Texas Department of Banking Limited Scope Examination of 1989 (February 15),
      11) State of Texas Department of Banking of 1989 (May 19),
      12) State of Texas Department of Banking of 1989 (December 15),
      13) FDIC Examination of 1974,
      14) FDIC Examination of 1975,
      15) FDIC Examination of 1976,
      16) FDIC Compliance Examination of 1976,
      17) FDIC Examination of 1977,
      18) FDIC Compliance Examination of 1977,
      19) FDIC Examination of 1978,
      20) FDIC Examination of 1980,
      21) FDIC Examination of 1981,
      22) FDIC Examination of 1983,
      23) FDIC Examination of October 1987,
      24) FDIC Trust Examination of 1987;
   f. Peat Marwick Independent Auditors Report, 1987 and 1988;
   g. Peat Marwick Management Letters,
      1) March 28, 1980,
      2) January 29, 1982,
      3) January 31, 1983,
      4) February 14, 1985,
      5) June 5, 1986,
      6) February 27, 1987,
      7) April 25, 1988,
      8) March 29, 1989;
   h. Charles Schreiner Bank Call Reports for the periods ending December 31, 1984, 1985, 1986, 1987, 1988 and 1989;
   i. Various policy statements passed by the Board of Directors of Charles Schreiner Bank,
      1) Funds Management Policy of July 1987 and July 1988,
      2) Investment Policy of July 1987 and July 1988,
      3) Security Program of July 1987 and August 1988,
      4) Loan Policy of September 1987,
      5) Code of Ethics Policy of December 1987,
      6) Community Reinvest Act Statement of March 1988,
      7) Bank Secrecy Act Statement of March 1988,
      8) Regulatory Compliance Policy of December 1988,
      9) Loan Policy Amendment of March 1989;
   j. Various loan documents and supporting information regarding loans to H. Dale Priour and related interests (Ranchman's Wool & Mohair, Inc.; Ranchman's Wool & Mohair Export and Priour–Varga Wool & Mohair);
   k. Various loan documents and supporting information regarding loans to Charles Schreiner, and Y.O. Ranch, L.D. Brinkman and LDB Corporation;
   l. Deposition of Jasper Moore, Jr., Volumes 1 and 2 (February 3, 1989);
   m. Video Deposition of Charles H. Johnson (November 22, 1993);

opinion that numerous and repeated actions of the directors in the time period of 1984 through 1990 involved *gross negligence* that put the Bank [Chas. Schreiner Bank] in extreme risk of loss." [23]  Dr. Carden also characterizes the several hundred loans allegedly made by the defendants to themselves and their businesses in violation of Regulation O as "a prime example of *gross negligence*." [24] Likewise, the defendants' practice of approving new loans for the purpose of paying off old loans "reveals *gross negligence*." [25]  Dr. Carden sees defendant Jasper Moore's failure to vote against loans to defendant H. Dale Priour when he knew that Priour was not credit-worthy as "a self-evident example of *gross negligence*." [26]  In this same vein, Dr. Carden declares that "[i]t was *gross negligence* to allow repeated violations of Regulation O and such sloppy lending standards to continue when members of the Board were aware that Defendant Priour was in financial difficulty." [27]  So too, Dr. Carden opines, "[i]t was *gross negligence* to allow repeated violations of Regulation O and such sloppy lending standards to continue when members of the Board were aware that insiders Schreiner and Brinkman were in financial difficulty." [28]  With regard to the upstreaming of $3,500,000 in dividends from Charles Schreiner Bank to its holding company, Schreiner Bancshares, Inc., to repay loans from defendant Jane Flato Smith to SBI, Dr. Carden judges the failure of the defendants who served on the executive committee of CSB to reveal to the board that the FDIC was dropping CSB's CAMEL rating to the very poor level of a "4" rating "a matter of *gross negligence*." [29]  Dr. Carden also finds

that defendant Jasper Moore "was *grossly negligent* and breached his fiduciary duties" in failing to attend many board meetings. [30] Lastly, in the final paragraph of his affidavit, Dr. Carden states:

> From 1984 through 1990, there were repeated failures on the part of the Board of Directors (1) to effectively monitor the performance of the institution (especially its actions in the extension of credit); (2) to develop any strategic orientation for the bank; (3) to protect and balance the interest of the various stockholders in the institution (regulators, employees, management, customers, shareholders, etc.); (4) to ensure the Bank's compliance with all laws and regulations (particularly Regulation O); (5) to establish and monitor effective policies, and (6) to ensure competent management. *In summary, it is my opinion that these repeated and ongoing failures were on such a grand scale and of such a destructive nature that these actions represented the gross negligence of the Defendants and were the proximate cause of the failure of the Chas. Schreiner Bank.*

*Id.* at p. 26 (emphasis added).

Thus, it is the estimation of Dr. Carden, the FDIC's own expert, that the actions of the defendants rose to the level of gross negligence. As *Acton* teaches, however, "an allegation of gross negligence is not enough to toll limitations ... under the doctrine of adverse domination." 49 F.3d at 1092. Consequently, any claims of the FDIC which accrued prior to the two years preceding the dates the FDIC was appointed as receiver of

---

n. Video Deposition of Charles Schreiner, Volumes 1, 2 and 3 (November 18–19, 1993);

o. Declaration of Raymond V. Barker (January 28, 1994);

p. Copies of two recent Texas Supreme Court decisions affecting the definitions of "proximate cause" and "gross negligence", *Wal–Mart v. Alexander* and *Transportation Insurance Company v. Moriel.*

Carden Affidavit, pp. 11–13.

23. *Id.* at p. 15 (emphasis added).

24. *Id.* (emphasis added).

25. *Id.* at p. 17 (emphasis added).

26. *Id.* at p. 18 (emphasis added).

27. *Id.* at p. 21 (emphasis added).

28. *Id.* at p. 23 (emphasis added).

29. *Id.* at p. 25 (emphasis added).

30. *Id.* at p. 25 (emphasis added).

CSB [31] and Ingram State Bank [32] are barred by limitations.

## CONCLUSION

Based on the above findings of fact and conclusions of law, it is ORDERED that the Motions to Dismiss of Charles Schreiner, III, Raymond F. Barker, H. Dale Priour, Jasper Moore, Jr. Flato Smith, Charles H. Johnston, and H. Dale Priour be, and the same are hereby, GRANTED with respect to the FDIC's claims as to the following loans or repayment of loans, which the Court finds to be time-barred:

A. Loans to Ranchman's Wool and Mohair Export, Inc.

1. CSB Loan 4072569–9048;
2. CSB Loan 4072569–9049;
3. CSB Loan 4072569–9044;
4. CSB Loan 4072569–9061;
5. CSB Loan 4072569–9066;
5. CSB Loan 4072569–9054;
6. CSB Loan 4072569–9062;
7. CSB Loan 4072569–9065;
8. CSB Loan 4072569–9068;
9. CSB Loan 4072569–9072;
10. CSB Loan 4072569–9042;
11. CSB Loan 4072569–9045;
12. CSB Loan 4072569–9046;
13. CSB Loan 4072569–9056;
14. CSB Loan 4072569–9047;
15. CSB Loan 4072569–9059;
16. CSB Loan 4072569–9067;
17. CSB Loan 4072569–9052;
18. CSB Loan 4072569–9053;
19. CSB Loan 4072569–9058;
20. CSB Loan 4072569–9040;
21. CSB Loan 4072569–9060;
22. CSB Loan 4072569–9063;
23. CSB Loan 4072569–9039;
24. CSB Loan 4072569–9050;
25. CSB Loan 4072569–9064;
26. CSB Loan 4072569–9041;
27. CSB Loan 4072569–9051; and

28. CSB Loan 4072569–9057.

B. Loans to Priour–Varga Wool and Mohair, Inc.

1. CSB Loan 3996063–9064;
2. CSB Loan 3996063–9068;
3. CSB Loan 3996063–9069;
4. CSB Loan 3996063–9077;
5. CSB Loan 3996063–9083;
6. CSB Loan 3996063–9087;
7. CSB Loan 3996063–9054;
8. CSB Loan 3996063–9065;
9. CSB Loan 3996063–9047;
10. CSB Loan 3996063–9055;
11. CSB Loan 3996063–9085;
12. CSB Loan 3996063–9088;
13. CSB Loan 3996063–9084;
14. CSB Loan 3996063–9089;
15. CSB Loan 3996063–9081;
16. CSB Loan 3996063–9070;
17. CSB Loan 3996063–9071;
18. CSB Loan 3996063–9072;
19. CSB Loan 3996063–9078;
20. CSB Loan 3996063–9048;
21. CSB Loan 3996063–9078;
22. CSB Loan 3996063–9062;
23. CSB Loan 3996063–9076;
24. CSB Loan 3996063–9079;
25. CSB Loan 3996063–9049;
26. CSB Loan 3996063–9050;
27. CSB Loan 3996063–9058; and
28. CSB Loan 3996063–9063.

C. Loans to Ranchman's Wool and Mohair, Inc.

1. CSB Loan 4074811–9066;
2. CSB Loan 4074811–9067;
3. CSB Loan 4074811–9054;
4. CSB Loan 4074811–9064;
5. CSB Loan 4074811–9078;
6. CSB Loan 4074811–9058;
7. CSB Loan 4074811–9069;
8. CSB Loan 4074811–9086;
9. CSB Loan 4074811–9090;

**31.** The FDIC was appointed as receiver of CSB on April 19, 1990. Therefore, any of the subject loans made by CSB prior to April 19, 1988 are time-barred.

**32.** The FDIC was appointed as receiver of ISB on September 4, 1990.

10. CSB Loan 4074811–9068;

11. CSB Loan 4074811–9063;

12. CSB Loan 4074811–9077;

13. CSB Loan 4074811–9093;

14. CSB Loan 4074811–9053;

15. CSB Loan 4074811–9076;

16. CSB Loan 4074811–9084;

17. CSB Loan 4074811–9052;

18. CSB Loan 4074811–9062;

19. CSB Loan 4074811–9085;

20. CSB Loan 4074811–9048;

21. CSB Loan 4074811–9049;

22. CSB Loan 4074811–9059;

23. CSB Loan 4074811–9050;

24. CSB Loan 4074811–9074;

25. CSB Loan 4074811–9070;

26. CSB Loan 4074811–9091;

27. CSB Loan 4074811–9087;

28. CSB Loan 4074811–9071;

29. CSB Loan 4074811–9072;

30. CSB Loan 4074811–9081;

31. CSB Loan 4074811–9055;

32. CSB Loan 4074811–9056;

33. CSB Loan 4074811–9079;

34. CSB Loan 4074811–9065;

35. CSB Loan 4074811–9051;

36. CSB Loan 4074811–9061;

37. CSB Loan 4074811–9075;

38. CSB Loan 4074811–9083; and

39. CSB Loan 4074811–9092.

D. Loans to Dale Priour

1. CSB Loan 3987967–9011;

2. CSB Loan 3987967–9012;

3. CSB Loan 3987967–9020;

4. CSB Loan 3987967–9014;

5. CSB Loan 3987967–9015;

6. CSB Loan 3987967–9019;

7. CSB Loan 3987967–9021;

8. CSB Loan 3987967–9029;

9. CSB Loan 3987967–9017;

10. CSB Loan 3987967–9013; and

11. CSB Loan 3987967–9023.[33]

E. Loans to Lloyd D. Brinkman

1. CSB Loan 9002;

2. CSB Loan 9003;

3. CSB Loan 9005; and

4. CSB Loan 9006.

F. Loan to LDB Corporation

1. CSB Loan 9001.

G. Loans to Dale Elmore

1. CSB Loan 9053; and

2. CSB Loan 9054.

H. Dividends

1. Any dividends upstreamed by CSB to Schreiner Bancshares, Inc. prior to April 19, 1988 to repay Jane Flato Smith for loans she made to Schreiner Bancshares, Inc.

IT IS FURTHER ORDERED that the defendants' motions to dismiss on the basis of limitations be DENIED as to the following loans: [34]

A. Loans to Ranchman's Wool and Mohair Export, Inc.

1. CSB Loan 4072569–9070;

2. CBS Loan 4072569–9072;

3. CSB Loan 4072569–9071; and

3. CSB Loan 4072569–9069.

B. Loans to Priour–Varga Wool and Mohair, Inc.

1. CSB Loan 3996063–9091;

2. CSB Loan 3996063–9092; and

3. CSB Loan 3996063–9093.

**33.** The FDIC alleges that loan 3987963–9023 "was renewed and extended five times over a three year period between 1986 through December 1989." *See* Plaintiff's Sixth Amended Complaint, p. 83, par. 219. However, it fails to give the dates of each renewal and extension. As a result, the Court is unable to ascertain which renewals and extensions were made prior to April 19, 1988 and which were made on or after that date.

Therefore, the FDIC is ORDERED to file **not later than Friday, June 23, 1995** an amendment of paragraph 219 of its Sixth Amended Complaint, without filing a whole new complaint, stating the date of each renewal or extension of loan 3987963–9023. The Court will then amend the instant order as warranted.

**34.** The Court will address the various motions to dismiss or, alternatively, for summary judgment of the defendants with regard to these loans in a separate order.

C. Loans to Ranchman's Wool and Mohair, Inc.

  1. CSB Loan 4074811–9094;
  2. CSB Loan 4074811–9096;
  3. CSB Loan 4074811–9101;
  4. CSB Loan 4074811–9100;
  5. CSB Loan 4074811–9097;
  6. CSB Loan 4074811–9099;
  7. CSB Loan 4074811–9095; and
  8. CSB Loan 4074811–9088.

D. Loans to Dale Priour

  1. CSB Loan 3987967–9031; and
  2. CSB Loan 3987967–9030.

E. Loans to Lloyd Brinkman

  1. CSB Loan 9007;
  2. CSB Loan 9010; and
  3. CSB Loan 9011.

F. Loans to LDB Corporation

  1. Extension of CSB Loan 9001 on November 1, 1988; and
  2. CSB Loan 9002.

G. Loan to Dale Elmore

  1. CSB Loan 9061

H. Dividends

  1. Any dividends upstreamed by CSB to Schreiner Banchsares, Inc. on or after April 19, 1988 to repay the loans to Schreiner Banchsares, Inc. from Jane Flato Smith.