United States Court of Appeals,

Fifth Circuit.

No. 94-40467.

FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellant,

v.

John HENDERSON, Jr., Defendant-Appellee.

Aug. 21, 1995.

Appeal from the United States District Court for the Eastern District of Texas.

Before GARWOOD, JOLLY and BARKSDALE, Circuit Judges.

GARWOOD, Circuit Judge:

Acting in its corporate capacity as manager of the Federal Savings and Loan Insurance Corporation (the FSLIC) Resolution Fund, plaintiff-appellant the Federal Deposit Insurance Corporation (the FDIC) appeals from the take-nothing judgment entered against it. As we agree with the district court's determination, based on a jury finding, that all the FDIC's claims are time-barred under Texas law, we affirm.

## Facts and Proceedings Below

This action arises out of the failure, in 1988, of two state-chartered, federally insured financial institutions, Home Savings and Loan Association (Home) of Lufkin, Texas, and its affiliate Southland Savings Association (Southland) of Longview, Texas. Defendant John Henderson (Henderson) was at all relevant times president, chief executive officer, and chairman of the board

1

of both institutions.[1] On August 16, 1991, the FDIC sued Henderson, complaining that, as an officer and director of Southland and Home, he had breached legal duties owed to the two institutions by engaging in unsafe and unsound lending practices with respect to eight large, high-risk, commercial real estate and construction loans made in 1984 and 1985.[2] The FDIC asserted that these highly speculative ventures cost Home and Southland $34.16 million ($29.05 million to Home, $5.11 million to Southland). The FDIC further alleged that these damages were the result of

---

[1]The Federal Home Bank Board (FHLBB) declared Southland insolvent and appointed the FSLIC receiver on August 18, 1988. The FHLBB did the same to Home on December 22, 1988. After becoming sole receiver of Southland and Home, the FSLIC, acting as receiver, sold certain of the institutions' assets to the FSLIC in its corporate capacity. Among the assets purchased by the FSLIC in its corporate capacity were the rights and claims asserted against Henderson in this case. Upon the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. 101-73, 103 Stat. 183 (1989), the FSLIC was abolished and its assets vested in the FDIC. 12 U.S.C. § 1821a(1) & (2). The FDIC is thus the real party in interest; it sues pursuant to its authority under FIRREA. *Id.* § 1821(k). *See FDIC v. Shrader & York,* 991 F.2d 216, 219-20 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994).

[2]These loans, which totaled over $82 million, are as follows, with claimed damages caused by default in parentheses: $20 million by Home to Secame Associates ($9.64 million); $17 million by Home and Southland to Phil Mockford ($6.88 million); $11.2 million by Home and Southland to S.R. Woerner, C.J. Woerner, and R.L. Woerner ($1.15 million); $8.6 million by Home and Southland to Jay A. Rosenbaum ($6.44 million); $10.4 million by Home to Westminster Glen Joint Venture ($3.65 million); $3.37 million by Home to Park Place, Ltd. ($700,000); $7.5 million by Home and Southland to Vista Crossings, Ltd. ($2.24 million); and $4.3 million by Home to Corpus Christi Crosstown, also known as Padre Island Joint Venture ($3.46 million). Some of these individual amounts were broken down into a series of two or three smaller loans. Of the $82 million in loans made by Home and Southland, Southland contributed roughly $5.5 million.

Henderson's ordinary negligence, gross negligence, breach of fiduciary duty, and breach of contract. The FDIC brought no claim of fraud or other intentional wrongdoing.

Henderson filed a motion for summary judgment on August 18, 1993, arguing in part that all the FDIC's claims were time-barred under Texas's two-year statute of limitations for tort actions. Tex.Civ.Prac. & Rem.Code Ann. § 16.003 (1986). Henderson argued that this limitations period also applied to the FDIC's breach of contract claim, which was wholly grounded on his alleged violation of the oath of office (by which he swore to execute his duties diligently and in compliance with federal law). Finally, Henderson argued that the limitations period was not tolled by the state common law doctrine of adverse domination, as the FDIC had alleged in its second amended complaint.

The district court granted in part Henderson's motion on March 10, 1994, dismissing as time-barred the FDIC's claim of ordinary negligence, but concluding that there remained a genuine issue of material fact concerning whether the limitations period on the remaining claims was tolled by adverse domination.[3] The case thus went to trial on March 13, 1994, on the issues of liability and adverse domination only. In response to interrogatories, the jury

---

[3]Citing *FDIC v. Dawson,* 4 F.3d 1303, 1307 (5th Cir.1993) (holding that such claims "sound in tort"), *cert. denied,* --- U.S. ----, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994), the district court concluded that the FDIC's breach of contract claim sounded in tort and was therefore also governed by Texas's two-year statute of limitations. The breach of contract claim, as such, was never submitted to the jury, and there is no issue on appeal regarding it.

found that Henderson had been grossly negligent and had breached his fiduciary duties to Home and Southland, thereby causing them to incur $7 million in damages ($5 million to Home, $2 million to Southland). The jury also found, however, that a majority of the Home and Southland boards of directors had not adversely dominated the institutions. Based on this finding, the district court held all the claims time-barred and entered a take-nothing judgment against the FDIC on March 31, 1994.[4] Thereafter, on April 11, 1994, the FDIC filed a motion for a new trial or to alter or amend the judgment, which the district court denied on April 18, 1994. On May 17, 1994, the FDIC filed this timely appeal.

## Discussion

Although FIRREA provides a federal statute of limitations for actions brought by the FDIC as receiver of a failed, federally insured lending institution, that period begins to run only if the claims acquired were still good under the applicable state statute of limitations on the date the FDIC (or the FSLIC) was appointed receiver. *Dawson,* 4 F.3d at 1307. In other words, if the claims acquired by the FDIC were time-barred under state law prior to the date of receivership, FIRREA will not revive them. *See Davidson v. FDIC,* 44 F.3d 246, 248 (5th Cir.1995). The FSLIC, the FDIC's predecessor, was appointed Southland's receiver on August 18, 1988,

---

[4]In so doing, the district court did not, as the FDIC suggests, somehow set aside the jury verdict. The judgment in this case was based entirely on the jury's express determination that a majority of the Home and Southland boards did not adversely dominate the institutions.

4

and Home's on December 22, 1988.[5]  *See supra* note 1.  We must decide whether, on these two dates, the claims acquired by the FSLIC were barred under Texas law.

It is undisputed that the unsound banking practices involved in this suit ended no later than some time in 1985 and that, as a result, the claims against Henderson accrued at that time.  *Dawson,* 4 F.3d at 1308.[6]  It is also undisputed that the applicable state statute of limitations is two years and that the FSLIC became receiver more than two years after the claims' accrual.  *See* Tex.Civ.Prac. & Rem.Code Ann. § 16.003(a) (Vernon 1986). Therefore, unless the statute of limitations was tolled, the FDIC's claims were time-barred under Texas law when the FSLIC was appointed receiver, and they cannot be revived by FIRREA.  *See Davidson,* 44 F.3d at 248.  The FDIC maintains that, even if the claims were time-barred under state law, a new federal law has since resuscitated them.  In the alternative, the FDIC asserts that the claims were not time-barred under Texas law because the two-year statute of limitations was tolled by adverse domination.

---

[5]FIRREA's statute of limitations for tort claims acquired by the FDIC as receiver is either three years or the applicable state law period, whichever is longer.  *See* 12 U.S.C. § 1821(d)(14).  The federal limitations period begins the date the FDIC (or its predecessor, the FSLIC) is appointed receiver or the date the cause of action accrues, whichever is later.  *Id.*  The FDIC brought this action on August 16, 1991, two days short of three years from the date the FSLIC was appointed receiver of Southland.

[6]The claims in this case accrued when the loans were approved.  *RTC v. Seale,* 13 F.3d 850, 852 (5th Cir.1994). Although not all the precise approval dates are in the record, it is undisputed that all eight transactions were approved sometime in 1984 or 1985.

5

Specifically, the FDIC complains that the district court erred in refusing its proposed instruction on a competing theory of adverse domination, the so-called complete domination theory, which, the FDIC contends, was supported by the evidence in this case. We consider these contentions in turn.

I. Riegle-Neal Act

On September 29, 1994, four months after the FDIC filed its notice of appeal in this case, President Clinton signed into law the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, Pub.L. No. 103-328, § 201, 108 Stat. 2368 (1994) (the Act). Section 201(a) of the Act amends section 11(d)(14) of FIRREA, 12 U.S.C. § 1821(d)(14), by providing the following new subsection:

> "(C) Revival of expired State causes of action.—
>
>> (i) In general.—In the case of any tort claim described in clause (ii) for which the statute of limitation applicable under State law with respect to such claim has expired not more than 5 years before the appointment of the Corporation as conservator or receiver, the Corporation may bring an action as conservator or receiver on such claim without regard to the expiration of the statute of limitation applicable under State law.
>>
>> (ii) Claims described.—A tort claim referred to in clause (i) is a claim arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the institution." 12 U.S.C. § 1821(d)(14)(C).

The FDIC argues that this Act revives any claims that were barred when acquired by the FSLIC. Henderson counters that the statute, by its terms, is inapplicable to these claims. Thus, although all the FDIC's claims sound in tort and although none became time-barred under Texas law more than five years before the FSLIC's appointment as receiver, we must still decide whether these tort

6

claims are the type described by the Act—whether, in other words, they are claims "arising from" fraud or intentional misconduct ("resulting in unjust enrichment" or "substantial loss to the institution"). *Id.*

The FDIC neither brought nor tried this case on a theory of fraud or any other intentional wrongdoing. Not in its original, first amended, or second amended complaint, nor in the pre-trial order, did the FDIC ever assert theories of fraud or other intentional misconduct, nor did it request jury instructions or obtain a jury finding on any such theory. Indeed, in opposition to the possible admission of evidence of Henderson's honest character (or any other character evidence intended to show that he "was not a crook"), the FDIC expressly disclaimed that it had brought a claim of fraud. Even if we were to agree with the FDIC that the "arising under" language of section 201 indicates that its applicability does not strictly depend on "the form of the FDIC's complaint," we still cannot say that Henderson did in fact engage in intentional wrong-doing, because the jury made no findings to that effect. Regarding liability, the jury was instructed only on the theories of gross negligence and breach of fiduciary duty. Under either theory, the jury could obviously have found liability for acts that were neither intentional nor fraudulent.

Nevertheless, the FDIC relies heavily on evidence that Henderson used the associations to fund his enjoyment of "luxury

automobiles and aircraft."[7]    Although some such evidence was admitted at trial, the FDIC has never asserted to what extent, *if any,* these alleged acts damaged Home or Southland.   Nor did the FDIC ever pray—in the pleadings, pre-trial order, or otherwise—for any relief from this alleged misconduct.   At all times, the FDIC has focused exclusively on Henderson's acts and omissions relating only to eight specific loan transactions.   Indeed, at trial, an FDIC witness was asked to testify concerning "the damages that the FDIC has claimed in this case."   As both counsel and the witness made explicit, these damages were exclusively losses suffered as a result of the "eight targeted loan transactions ... that we are here today on."   We also note that during closing argument, counsel for the FDIC asked the jury to consider in its deliberations an exhibit that listed the eight loans at issue and the damages, to the penny, suffered as a result of their default.   This exhibit reflects no other damages.   Finally, the jury interrogatories on liability asked merely if Henderson had been grossly negligent or had breached his fiduciary duty "with regard to any of the transactions at issue in this case";   the only transactions referred to in the jury instructions are the eight loans.   We thus reject any after-the-fact suggestion by the FDIC that it ever sought recovery for, or asked the jury to make findings on, these alleged acts of intentional misconduct.

In short, there is nothing about the jury's verdict which

---

[7]The first mention of such acts appears in the FDIC's second amended complaint.

could be said to establish that Henderson acted intentionally.[8]  It is simply not enough for the FDIC to hypothesize that the jury *could have* found that Henderson so acted.  The FDIC failed to seek such a finding, and we reject its suggestion at oral argument that this failure is justified by the post-trial passage of section 201.  Whatever retroactive effect the Act has, it has it for both sides.  Accordingly, we hold that by its terms section 201 does not apply to the claims brought by the FDIC in this case.  Accordingly, we need not consider Henderson's alternative contentions:  that section 201 of the Act violates the Tenth Amendment and that it does not apply retroactively to suits filed before the statute's enactment.

## II. Adverse Domination

We turn now to the FDIC's alternative contention—that the district court erred in refusing its proposed instruction on a competing theory of adverse domination.  We review with deference a trial court's refusal to give a proposed instruction.  *Treadaway v. Societe Anonyme Louis-Dreyfus,* 894 F.2d 161, 167 (5th Cir.1990).  As a threshold matter, the complaining party must show that its proposed instruction correctly states the law.  *Id.*  If it does, we must then determine whether the charge as given was accurate or misleading.  A judgment will be reversed only when the charge as a whole leaves us with a "substantial and ineradicable doubt whether

---

[8]The quantum of damages actually awarded in this case ($7 million out of over $34 million sought) also undercuts the FDIC's suggestion that the jury's verdict on liability implies that it found Henderson's acts especially culpable or that it awarded damages not specifically sought.

the jury has been properly guided in its deliberations." *FDIC v. Mijalis,* 15 F.3d 1314, 1318 (5th Cir.1994) (citations and quotation marks omitted).  If we are convinced, after reviewing the record as a whole, that the district court's failure to include the instruction did not affect the outcome of the case, then the judgment will not be reversed.  *Id.*

The proposed instruction in this case concerns the FDIC's asserted state law rule of adverse domination.  Adverse domination is a common law doctrine used to toll limitations on a corporate action while the corporation is controlled by those culpably involved in the wrongful conduct on which the action is based.[9] *See RTC v. Fleischer,* 826 F.Supp. 1273, 1276 (D.Kan.1993);  *see generally* J. Wilkie, Jr., FDIC v. Dawson:  *The Fifth Circuit Reins in Bank Regulators' Enforcement Rights Under FIRREA,* 69 Tul.L.Rev. 288, 290-92 (1994).  It is often said that the doctrine "rests on the theory that if the wrongdoers controlled the corporation ..., there would consequently be no one to sue them."  3A Stephen M. Flanagan & Charles R.P. Keating, *Fletcher Cyclopedia of the Law of Private Corporations* § 1306.20 (Supp.1994) [hereinafter *Fletcher* ]. We have emphasized that one rationale for the doctrine is "that a wrongdoing corporate officer or director will seek to hide his or her wrongful conduct from the corporation."  *Shrader & York,* 991 F.2d at 227;  *see Dawson,* 4 F.3d at 1310, 1312-13.

Relying on the only Texas case to address this issue, *Allen v.*

---

[9]In *Dawson,* we held that state tolling principles control federal courts' application of state statutes of limitation.  4 F.3d at 1308-09.

*Wilkerson,* 396 S.W.2d 493 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.), this Court in *Dawson* determined that adverse domination has been recognized in Texas as an equitable tolling doctrine that suspends the running of limitations while the corporation continues under the domination of the wrongdoers, who are the adversaries of the action.  4 F.3d at 1309-10.  Observing that the doctrine is "very narrow," *id.* at 1312, we determined that Texas follows the "majority test," one of two general versions of the adverse domination doctrine.  *Id.* at 1310.  Under the majority test, if a majority of the board of directors are culpably involved in the alleged wrongdoing, then we assume that the corporation was adversely dominated and was thus unable to pursue a direct action against the wrongdoing directors.[10]  In other words, although the law usually presumes that directors will exercise their fiduciary duties and sue on behalf of the corporation when it is wronged, that presumption is reversed when a majority of the board is

---

[10]We note that a Texas corporation may sue a culpable officer or director if a majority of the board of directors "present at a meeting in which a quorum is present" agrees to bring suit (unless a greater number is required by the articles of incorporation or bylaws).  Tex.Bus.Corp.Act Ann. art. 2.34 (West Supp.1995).  A quorum represents a majority of the total directors unless the articles of incorporation or bylaws provide otherwise.  In no event, however, may a quorum be less than one-third of the total number of directors.  *Id.*  Texas-chartered banks, moreover, must at all times have at least five directors. Tex.Rev.Civ.Stat.Ann. art. 342-404 (West 1973 & Supp.1995). Finally, we note that an officer of the corporation may be authorized to sue on behalf of the corporation if the bylaws or the directors grant him such authority.  *Id.* art. 2.42(B); *Valley v. International Properties, Inc. v. Brownsville Savings and Loan Association,* 581 S.W.2d 222, 227 (Tex.Civ.App.—Corpus Christi 1979, no writ) (an officer has no authority "to conduct litigation for the corporation" absent a grant of such authority by the bylaws or a directors' resolution).

culpably involved in the alleged wrongdoing. *Dawson,* 4 F.3d 1309-11. The statute of limitations is thereby tolled until a majority of the directors is disinterested and informed of the wrongdoing. *Id.*

Although it is not necessary to sue a majority of the board to obtain a finding of adverse domination, the plaintiff still bears the burden of proving the culpability of a majority of the board members during the relevant time period. *Dawson,* 4 F.3d at 1311 (holding that the majority rule does not shift onto the defendant "the burden of proving that a majority of the board was *not* culpable"). In so doing, the FDIC must establish that the culpable directors are guilty of more than mere negligence or even gross negligence; it must show that they have actively participated in fraud or other intentional wrongdoing with regard to the claims at issue. *RTC v. Acton,* 49 F.3d 1086, 1091 (5th Cir.1995). Proof that a majority of the board is actively and purposefully engaged in the wrongdoing reverses the presumption that informed directors will induce the corporation to sue culpable ones and thereby establishes that the institutions are dominated by directors adverse to the claims in question. *Cf. Gaubert v. United States,* 885 F.2d 1284, 1291 (5th Cir.1989) (noting the presumption in Texas that the directors will exercise good business judgment in their management of the corporation); *Fletcher* § 990 (noting the presumption that directors will properly run the corporation).[11]

---

[11]The law in Texas on derivative actions reflects the presumption that directors will, when appropriate, sue on behalf of the corporation. Tex.Bus.Corp.Act.Ann. art. 5.14 (West 1980).

This is the majority version of adverse domination.

There is, however, a competing rule, the so-called complete domination theory, and it is on this theory that the FDIC sought an instruction below. Unlike the majority test, the rule of complete domination may not necessarily depend on whether a majority of the board of directors is culpable or disinterested; application may depend instead on the degree of control the culpable individual or individuals have over the entire board. However, this rule is considered *harder* to satisfy than the majority version because it relies on no presumption of domination. It demands that the plaintiff prove "full, complete and exclusive control in the directors or officers charged," *Dawson,* 4 F.3d at 1309, and this at least means "that once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." *Int'l Rys. of Cent. Am. v. United Fruit Co.,* 373 F.2d 408, 414 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct.

---

Before suing one or more directors derivatively on behalf of the corporation, a shareholder must allege in the pleadings that a demand for suit was made on the board or that such a demand was futile. *See Dodson v. Kung,* 717 S.W.2d 385, 390 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The court will not simply presume that a demand would be futile where the defendants are on, or even in control of, the board; the plaintiff must allege specific facts "indicating the futility of the demand" and prove those facts at trial. *Zauber v. Murray Savings Ass'n,* 591 S.W.2d 932, 936-39 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.); *accord Aronson v. Lewis,* 473 A.2d 805 (Del.1984); *see also Fletcher* § 1040. As the court stated in *Zauber,* "Only when it can be shown that something *beyond un*sound business judgment has been exercised by the board of directors, resulting in a wrongful refusal to act, will a shareholder be allowed to institute the suit on behalf of the corporation." 591 S.W.2d at 936 (emphasis added).

13

2031, 18 L.Ed.2d 975 (1967); *see also Dawson,* 4 F.3d at 1309-10.

Whether the plaintiff can prove the effective impossibility of suit

is the key in the complete domination theory.[12] *Mosesian v. Peat,*

*Marwick, Mitchell & Co.,* 727 F.2d 873, 879 (9th Cir.), *cert.*

*denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984).

In this case, the district court gave the jury the following

instruction on adverse domination:

> "In order to prevail on any of its claims against
> [Henderson], the FDIC must prove that a certain legal doctrine
> called "adverse domination' applies in this case.  The term
> "adverse domination' refers to a situation where a majority of
> the board of directors that control a savings and loan, work
> together to operate the institution in an improper manner.
>
> As long as the savings and loan is under the control of
> these wrongdoing directors, there is little possibility that
> anyone could bring suit against the directors in the name of
> the savings and loan.  In such a situation, the savings and
> loan is said to be adversely dominated by its board of
> directors.
>
> ....
>
> In order for you to find that the board of directors of
> [Southland] and [Home] adversely dominated the two financial
> institutions, you must find that, in conducting business for
> the savings and loans, a majority of the directors (1) were
> grossly negligent, (2) breached their fiduciary duties of due
> care, loyalty, or allegiance, or (3) intentionally or
> willfully engaged in wrongful conduct.  It is not enough to
> conclude that the directors were merely negligent."[13]

---

[12]This conception of adverse domination is also sometimes
termed the "single disinterested director" theory, under which
the plaintiff must establish that there is "no one with knowledge
of facts giving rise to possible liability who could or would
have induced the corporation to bring an action."  *Hecht,* 635
A.2d at 403;  *see also Bryan,* 902 F.2d at 1523.

[13]At the time the district court instructed the jury on the
level of culpability required of the wrongdoing directors, we had
not yet decided *Acton.*  In *Acton,* we determined that, before the
majority test theory of adverse domination will apply, the
plaintiff must prove that the directors actively engaged in

14

This charge was clearly modeled on our decision in *Dawson,* where we stated that Texas law was in accord with the majority version of adverse domination. The district court's charge tracks *Dawson* by turning the applicability of adverse domination on the culpability *vel non* of a majority of the corporation's board of directors.

After this charge, and in response to interrogatories, the jury found that a majority of the directors of Home and Southland had not adversely dominated the institutions during the relevant period.[14] The FDIC, however, does not dispute the accuracy of the district court's given instruction on adverse domination or the jury's findings in response to it. Instead, the FDIC maintains that the charge was incomplete because it did not allow the jury to consider, in the alternative, the following instruction proposed by the FDIC:

> "The adverse domination doctrine may also apply if a defendant exercised full, complete, and exclusive control of the financial institution so as to prevent it from pursuing its

intentional wrongdoing; gross negligence, in other words, does not rise to the level of culpability required to raise the presumption of domination under the majority test. 49 F.3d at 1091.

[14]The jury was required to answer the following two questions:

> "Do you find, from a preponderance of the evidence, that a majority of the board of directors adversely dominated [Home] from 1984 to December 26, 1986?"

> "Do you find, from a preponderance of the evidence, that a majority of the board of directors adversely dominated [Southland] from 1984 to August 18, 1986?"

The December 26, 1986, and August 18, 1986, dates represent two years exactly from the date of the FSLIC's appointment as receiver of Home and Southland, respectively.

legal rights against the defendant. *FDIC v. Dawson,* 4 F.3d 1303 (5th Cir.1993); *see also RTC v. Seale,* [13 F.3d 850 (5th Cir.1994) ]. If [Henderson] adversely dominated Southland or Home so as to exercise full, complete, and exclusive control over the associations up until at least two years before the respective association failed, the FDIC's lawsuit was timely." (citations omitted).

This proposal purports to state the complete domination theory of adverse domination.[15]

We begin by noting that the FDIC has not cited, nor can we find, any Texas decision in which the court has tolled limitations because of a single director's complete domination of the wronged corporation. Indeed, in *Dawson,* after reviewing the only Texas case ever to consider adverse domination, we determined that Texas followed the majority rule, suggesting that it did not follow this competing theory. 4 F.3d at 1310; *accord FDIC v. Howse,* 736 F.Supp. 1437, 1441 (S.D.Tex.1990). Moreover, a recent, well-reasoned district court opinion, *RTC v. Bright,* 872 F.Supp. 1551, 1562 (N.D.Tex.1995), determined on summary judgment that Texas law required the plaintiff to prove the culpability of a board majority, rejecting the RTC's attempt to establish adverse domination by showing actual control of the three defendants, who,

---

[15]On the basis of this instruction, the FDIC apparently proposed the following jury interrogatory:

> "Did [Henderson] exercise such full, complete, and exclusive control of Southland so as to prevent it from pursuing its legal rights against [Henderson] through at least August 18, 1986?"

The FDIC makes no mention of this interrogatory in its brief nor anywhere indicates how it may affect the legitimacy of its proposed instruction. We therefore confine our analysis to the text of the instruction as cited and relied on by the parties.

although together a numerical minority of the board, collectively controlled 96% of the bank's stock.

Nor do we find persuasive support for a theory of complete domination in *Allen,* the decision of the Texas court of appeals interpreted in *Bright* and *Dawson.* There, the defendant was the single culpable director and only one of four board members, but controlled 80% of the corporation's capital stock and was alone considered the owner of the bank by its bookkeeper. *Allen,* 396 S.W.2d at 496, 499. The court stated that running of the statute of limitations on a corporate claim against a director concerning his corporate actions required that a majority of the board have notice (in the sense of knowledge of facts sufficient to put one under a duty to inquire) of, and be disinterested in, the challenged transactions. *Id.* at 500. Although there is broadly worded language in *Allen* that might be read to support a theory of complete domination, that language is *dicta* because the court clearly did *not* consider evidence of Allen's complete control of the corporation adequate to warrant tolling the limitations period. *See Bright,* 872 F.Supp. at 1565. We therefore cannot say that Texas has adopted the theory here advanced by the FDIC.

Even assuming that Texas would follow a complete domination theory of adverse domination in addition to the majority test, we believe that the FDIC's proposed instruction represents an inadequate and incomplete statement of the rule as we understand it. It is inadequate partly because it is too abstract, and such instructions are disfavored. *See Turlington v. Phillips Petroleum*

*Corp.,* 795 F.2d 434, 443 (5th Cir.1986);  9A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2556 (1995) ("[A]bstract charges typically are not favored by the federal courts....   [T]he courts have shown a distinct preference, particularly in complex cases, for instructions that relate the law to the evidence presented by the parties.").

At the very least, the proposed instruction is misleading because it fails to instruct the jury that it must find, and that the FDIC must prove, that Henderson not only exercised full and complete control over the directors, but also that *but for this control* the directors would have pursued a direct action against him on the transactions at issue.[16]  Total control alone—essentially the only required finding under the critical portion of the FDIC's proposed instruction—does not "negate the possibility that an informed stockholder or director could [or would] have induced the corporation to sue."  *Int'l Rys. of Cent. Am.,* 373 F.2d at 414; *see Dawson,* 4 F.3d at 1309-10.  It is *presumed* that board members will adhere to their fiduciary duties.  *See Dawson,* 4 F.3d at 1311.

---

[16]A parsing of the instruction's language exposes additional defects.  The critical portion of the instruction is its second sentence, in which the FDIC posed the following test:  "If [Henderson] adversely dominated the institution so as to exercise full, complete, or exclusive control over the associations up until at least two years before the respective associations failed, the FDIC's lawsuit is timely."  This instruction is somewhat confusing, almost tautological, as it essentially states that, if Henderson adversely dominated the institutions during this time, the claims are timely.  The issue for the jury, however, is not the legal conclusion that the claims are or are not timely, but the factual issue whether domination occurred; the instruction should therefore have focused on the factual findings that predicate a conclusion of adverse domination—an issue we discuss in more detail below.

In the absence of a majority of sufficiently culpable directors, this presumption cannot be overcome without a finding, which the FDIC's proposed instruction failed to require, that clearly ties Henderson's control of the boards specifically to the directors' effective inability to bring suit on the particular transactions at issue—without a finding in other words that the directors would have brought an action *but for* the defendant's complete exercise of control over them.[17]

The FDIC argues, however, that either of two theories supports the adoption of a complete domination rule of adverse domination, pointing to two situations in which a director with complete control could use his authority to negate the possibility of suit. The first is the concealment of the wrongdoing from the other directors. Significantly absent, however, from the FDIC's pleadings are allegations that Henderson used his authority to conceal from the board the facts concerning his wrongdoing on the

---

[17]The FDIC's general and overly abstract conception of complete domination is implicit in its pleadings on this issue, in which it alleged that Henderson, as the chief officer and director of Home and Southland and as the major stockholder of Home, "picked other members of the boards of directors and hired employees[,] supervised virtually every aspect of the business affairs of both [Southland and Home], including their day-to-day activities[, and] supervised commercial loan approval." Although a jury could find, if these allegations were proved, that Henderson's authority at Home and Southland was full and complete, it does *not* follow that he used this authority to negate the possibility of a corporate action against him. In other words, the fact of a director's complete control as a general matter is not so critical as how he actually exercised it in respect to barring possible recovery on the particular claims at issue.

19

eight loans at issue[18]—even though, at oral argument, the FDIC asserted that the adverse domination in this case mainly resulted from Henderson's control over the facts concerning his wrongdoing and his consequent ability to conceal them. Although we recognize that the risk of concealment is a principal rationale behind the general theory of adverse domination, *see Shrader & York*, 991 F.2d at 227, Texas law already adequately prevents a dominant director from benefiting from such deliberate acts under the tolling doctrine of fraudulent concealment. Texas courts have recognized fraudulent concealment as an affirmative defense to limitations that the plaintiff must plead and prove. *Matter of Placid Oil Co.,* 932 F.2d 394, 399 (5th Cir.1991); *Weaver v. Witt,* 561 S.W.2d 792, 793 (Tex.1977) (per curiam). *See also J.C. Kinley Co. v. Haynie Wire Line Serv., Inc.,* 705 S.W.2d 193, 198 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

The FDIC essentially asks this Court to rule that Texas would be willing to presume from the director's mere control the fact of intentional concealment; as Texas law makes plain, however, such must be pleaded and proved to the satisfaction of the jury. Even assuming that Texas would supplement its already existent protections against fraudulent concealment, we believe that the

---

[18]Indeed, the evidence at trial strongly undercuts the assertion that Henderson deliberately concealed such information. At various times during the relevant period, the directors at both Southland and Home received and considered numerous indications from bank examiners that the institutions were engaging in high-risk loans in violation of federal regulations, such as loans-to-one-borrower lending limits and loan underwriting controls.

jury would still have to find that the defendant in fact used his complete authority to actually conceal his wrongdoing from the rest of the board. In this case, however, neither the proposed instruction nor the pleadings make any mention of concealment. *See, e.g., Bright,* 872 F.Supp. at 1568-70 (RTC's pleadings alleged that the Texas statute of limitations was tolled by adverse domination, the discovery rule, and fraudulent concealment). Even if the state were to adopt some theory of complete domination, we cannot agree that the proposed instruction would properly state the law.

According to the FDIC, complete domination might also occur when the directors knew of the culpable director's wrongdoing but, because of his exercise of control over them, would not bring suit.[19] Once again, however, if this were the FDIC's theory in this case, its proposed instruction was deficient for failing to include a requirement that there be found a factual, causal connection between Henderson's alleged control and the boards' failure to bring suit. That Henderson generally had full control of the associations and that the boards failed to bring an action against him do not, standing alone, show adverse domination; the jury must

---

[19]The complete domination theory of adverse domination presumes a board with more than one director. If there is only one director and that director is culpably involved in the alleged wrong, then the majority test would apply, and domination of the corporation would be presumed so long as that director maintained sole control. Here, Henderson was alleged to be the only director of Southland for a short period of time until 1985. The FDIC, however, did not seek a separate jury finding on adverse domination during this period—presumably because the tolling of this entire period would still be inadequate to make the claims timely.

link these two facts—here with the theory that the director exercised his control to actually cause informed directors not to bring suit against him.[20] Moreover, it cannot be enough for the plaintiff simply to allege that the defendant has, in the past, threatened individual board members or prevented them from somehow acting. Nor can it be adequate simply to show that the culpable director had the *ability* to control the board because, for example, of his power to fire or remove informed directors;[21] otherwise, limitations would never run against a corporation where the culpable director or officer is also the majority shareholder. The general subservience or acquiescence of the non-culpable directors to the culpable director cannot alone rebut the presumption that the non-culpable directors will put the interests of the corporation above their own; that is, that they will exercise independent judgment. At the very least, therefore, the plaintiff would have to show, and the jury find, that the culpable director actually caused a board majority to abdicate their responsibility

---

[20]In this case, there was simply no evidence to support anything but the mere possibility that Henderson *could* have exercised such control. There is, for instance, no evidence that any directors considered suing on these transactions but did not because Henderson threatened to remove or fire them (or because the directors feared that).

[21]For instance, in this case, the FDIC presented some evidence at trial that Henderson threatened to fire an employee and director of Southland, Dennis Newsom, who had questioned his instructions to make wire transfers from Southland to Home. Another Southland board member and employee, Kathy Fleming, testified that she felt it would be "out of place" for her to question Henderson in front of the board.

to sue on the particular transactions in question.[22]

Finding no reversible error in the district court's refusal to include the FDIC's proposed instruction in its charge to the jury, we hold that the district court was correct to enter a take-nothing judgment on the jury's verdict against the FDIC.

## Conclusion

The judgment of the district court is

AFFIRMED.

---

[22]When non-culpable directors know of wrongdoing but will not bring suit against the responsible director or officer, those directors may have breached fiduciary duties they owe to the institution. We cannot, however, simply presume from the culpable director's general full control that informed, non-culpable directors will not do their duty and sue. To take advantage of that presumption, the defendant must at least follow the majority test and adequately prove the culpability of the board majority. Our reluctance to read the complete domination theory expansively is informed by *Dawson:* "[I]t could almost always be said that when one or two directors actively injure the corporation, or profit at the corporation's expense, the remaining directors are at least negligent for failing to exercise "every precaution or investigation.' If adverse domination theory is not to overthrow the statute of limitations completely in the corporate context, it must be limited...." 4 F.3d at 1312.